**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-2738
_____

CHARLES MACK,

Appellant

v.

WARDEN LORETTO FCI, TIM KUHN, Associate Warden,
JEFF STEVENS, Trust Fund Officer, Sued in their Individual
and Official Capacities; D. VESLOSKY, Correctional
Officer, DOUG ROBERTS, Correctional Officer, Sued in
their Individual Capacities
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 3-10-cv-0264)
District Judge:  Hon. Kim R. Gibson
_____

Argued April 18, 2016

Before:  MCKEE[1], *Chief Judge*, FUENTES,[*] and ROTH,
*Circuit Judges*

(Opinion Filed: October 11, 2016)

Sean E. Andrussier, Esq.
John Bailey, Law Student
Anne Showalter, Law Student
Russell Taylor, Law Student **[ARGUED]**[**]
Duke University School of Law
Science Drive and Towerview Road
Box 90360
Durham, NC 27708

*Counsel for Appellant*

---

[1] Judge McKee was Chief Judge at the time this appeal was argued. Judge McKee completed his term as Chief Judge on September 30, 2016

[*] Honorable Julio M. Fuentes assumed senior status on July 18, 2016.

[**] Law students were permitted to enter their appearances and participate in oral argument pursuant to Third Circuit L.A.R. 46.3.

Jennifer R. Andrade, Esq.
Jane M. Dattilo, Esq. **[ARGUED]**
Rebecca R. Haywood, Esq.
Office of United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219


*Counsel for Appellees*

_____

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*.

Charles Mack is a Muslim inmate who claims that he was terminated from his paid work assignment for complaining to a prison official about two correctional officers' anti-Muslim harassment at work. He also claims that the same officers' harassment had caused him to refrain from praying while at work. Mack brought this lawsuit *pro se* against various prison employees seeking monetary relief for alleged violations of his rights under the First Amendment, Fifth Amendment, and the Religious Freedom and Restoration Act ("RFRA"). The District Court dismissed all of Mack's claims.

Mack's allegations raise several issues of first impression in our Circuit, including (1) whether an inmate's

oral grievance to prison officials can constitute protected activity under the Constitution; (2) whether RFRA prohibits individual conduct that substantially burdens religious exercise; and (3) whether RFRA provides for monetary relief from an official sued in his individual capacity. We answer all three questions in the affirmative, and therefore conclude that Mack has sufficiently pled a First Amendment retaliation claim and a RFRA claim. We agree, however, that Mack's First Amendment Free Exercise claim and Fifth Amendment equal protection claim must be dismissed. We will therefore affirm in part, vacate in part, and remand to the District Court for further proceedings.

## I.     BACKGROUND

### A.     Mack's Allegations of Anti-Muslim Harassment

Mack's *pro se* complaint includes the following allegations, which we assume are true for purposes of this appeal.[2] Mack is an inmate at the Federal Correctional Institution in Loretto, Pennsylvania ("FCI Loretto"). He worked for pay in the prison's commissary from approximately May 2009 until he was terminated in October

---

[2] *Finkelman v. Nat'l Football League*, 810 F.3d 187, 190 n.11 (3d Cir. 2016). Because Mack proceeded *pro se* up until this appeal, we will also consider his allegations made in response to the defendants' motion to dismiss, which incorporate and are consistent with the allegations in his complaint. *See Hughes v. Rowe*, 449 U.S. 5, 9-10 & n.8 (1980) (per curiam) (considering *pro se* plaintiff's amended complaint and response to the defendants' motion to dismiss to conclude that plaintiff sufficiently stated a claim).

2009.  His job responsibilities included stocking shelves, filling inmate commissary orders, and cleaning the work area. As a practicing Muslim, Mack was provided certain religious accommodations at work.  For example, Mack did not have to handle pork products at the commissary, he was provided a suitable area in which he could pray during breaks, and he was permitted to attend religious services on Friday.[3] Defendants Doug Roberts and Samuel Venslosky are correctional officers at FCI Loretto who were assigned to supervise the commissary at the time Mack worked there. They were responsible for the safety and security of the inmates and the orderly operation of the commissary.

While Mack was at work one day, Officer Roberts walked up behind him and slapped him hard on the back. Mack asked Roberts why he had hit him, to which Roberts responded, "do you have a problem with what I did?"[4]  Mack said "yes," and Roberts declared, "you'll be looking for another job soon!"[5]  Officer Venslosky and other inmates witnessed this interaction and laughed.  The officers and inmates continued to laugh and snicker at Mack throughout his shift.  When Mack finished work and left the commissary, a fellow inmate informed him that he had an "I LOVE BACON" sticker affixed to the back of his shirt.  Roberts

---

[3] *See, e.g.*, *Williams v. Bitner*, 455 F.3d 186, 191-92 & n.6 (3d Cir. 2006) (recognizing that practicing Muslims do not handle pork); *Williams v. Morton*, 343 F.3d 212, 219 (3d Cir. 2003) (recognizing that practicing Muslims pray five times each day).

[4] Am. Compl. (J.A. Vol. II 56-62) ¶ 14.

[5] *Id.*

5

knew that Mack is Muslim and that Islam forbids the handling and consumption of pork. The next day, Mack asked Roberts why he had slapped the offensive sticker on his back. Roberts asked Mack if he had a problem with that, and then declared again, "don't worry you'll be looking for another job soon!"[6] A few days later, while Mack was at work, Roberts loudly told Mack in the presence of Venslosky and other inmates that "there is no good Muslim, except a dead Muslim!"[7] Venslosky and other inmates heard this comment and laughed.

Mack claims that the officers' anti-Muslim harassment and animus created a tense work environment and caused him to fear that he could be harmed at work because of his religious beliefs. He "continued his work assignment very carefully and nervously[,] not knowing whether an inmate commissary worker [might] act out on Defendant Roberts['] statement and attempt to physically harm [him] for being Muslim."[8] While Mack was permitted to pray at work, the officers' conduct "created a threatening [and] hostile environment, that literally caused [him] to change his behavior in that [he] would no longer pray in that area, and would wait until he got off work."[9]

---

[6] *Id.* ¶ 17.

[7] *Id.* ¶ 18.

[8] Compl. (J.A. Vol. II 33-43) ¶ 35.

[9] *Mack v. Yost*, No. 3:10-cv-264, ECF No. 42 (Pl. Mem. in Opp'n to Defs.' Mot. to Dismiss), at 4.

## B.   Mack's Complaints to Prison Staff

Seeking redress, Mack spoke with Jeff Stephens, who was Roberts' and Venslosky's supervisor.[10]   Mack orally complained to Stephens about Roberts' anti-Muslim conduct and statements, and about Venslosky's inaction during both incidents.  Stephens agreed to "look into it."[11]  Approximately one week later, Venslosky told Mack that he was being fired from his commissary position for "bringing in other inmates' commissary slips."[12]  Mack replied that this was untrue, and that the only reason he was being fired was because he had complained to Stephens. Venslosky did not respond.

Convinced that Venslosky's reason for firing him was a sham, Mack located Stephens during his lunch period and orally complained to him about his termination.  Stephens again responded that he would look into it. When nothing came of that, Mack filed an inmate request-to-staff form seeking an explanation in writing for his termination. Stephens provided Mack with a written response from Venslosky asserting that Mack was "caught bringing slips in for inmates."[13]  Mack then orally complained to the Warden, John Yost, during his next lunch period.   The Warden

---

[10] Am. Compl. ¶¶ 4, 21.

[11] *Id.* ¶ 21.

[12] *Id.* ¶ 22.  It is unclear from the record what "bringing in other inmates' commissary slips" means and why it is a punishable offense.  For purposes of this appeal, this ambiguity is irrelevant.

[13] *Id.* ¶ 26.

responded, "[w]hat do you expect me to do?"[14]    Finally, Mack filed a formal grievance. Deputy Warden Tim Kuhn repeated the same reason for Mack's termination in his response to Mack's formal grievance. Mack then filed this federal lawsuit.

## C.    Procedural History

Mack filed suit *pro se* against Roberts, Venslosky, Stephens, Warden Yost, and Deputy Warden Kuhn for alleged constitutional violations pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*,[15] and for violations of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA").[16] Among other things, Mack alleged that the defendants violated his rights under the Petition Clause of the First Amendment, which protects "the right of the people . . . to petition the Government for a redress of grievances."[17]    In particular, Mack claimed that he was retaliated against for seeking to redress his grievances, that is, for orally complaining to Stephens about Roberts' and Venslosky's anti-Muslim conduct.

The District Court dismissed the complaint for failure to state a claim under Federal Rule of Civil Procedure

---

[14] *Id.* ¶ 28.

[15] 403 U.S. 388 (1971) (recognizing an implied private right of action for damages against federal officials alleged to have violated a person's constitutional rights).

[16] 42 U.S.C. §§ 2000cc *et seq.*

[17] U.S. Const. amend. I, cl. 4.

12(b)(6). Mack appealed, and this Court vacated and remanded.[18] We directed the District Court to consider in the first instance whether an inmate's oral complaint to prison staff constitutes protected activity under the First Amendment's right to petition.[19] We noted that "[f]iling a formal prison grievance clearly constitutes protected activity," but acknowledged that "certain informal, oral complaints to prison personnel have been held to constitute protected activity as well."[20] We also explained that Mack's allegations "clearly invite inquiry into" whether the defendants violated Mack's "First Amendment right to practice as a Muslim," and that Mack's claims should not have been dismissed without leave to amend.[21]

At the direction of the District Court, Mack filed an amended complaint, which largely tracks his original complaint. Construed liberally, Mack's amended complaint raises three constitutional claims and one statutory claim: (1) First Amendment retaliation, invoking the Petition Clause; (2) First Amendment Free Exercise Clause violation; (3) Fifth Amendment equal protection violation; and (4) Religious Freedom and Restoration Act violation.[22] From Roberts and

---

[18] *Mack v. Yost*, 427 F. App'x 70 (3d Cir. 2011).

[19] *Id.* at 72.

[20] *Id.*

[21] *Id.* at 73.

[22] 42 U.S.C. § 2000bb-1(a). The District Court properly construed Mack's claim under RLUIPA, which does not apply to federal government actions, as a claim under RFRA, which does. *See Mack v. Yost*, 979 F. Supp. 2d 639, 650 (W.D. Pa. 2013) ("Because provisions under the RFRA are

Venslosky only, Mack seeks back pay plus interest for each month since he was removed from his commissary position. He seeks from all defendants $75,000 each in punitive damages.[23]

The District Court dismissed Mack's amended complaint, too, for failure to state a claim under Rule 12(b)(6). Addressing Mack's First Amendment retaliation claim, the District Court held that "[a]n oral complaint to a prison guard is not a petitioning for the redress of grievances guaranteed by the First and Fourteenth Amendments."[24] The Court accordingly dismissed this claim, reasoning that Mack "had not filed a petition with an administrative agency, whether by formal or informal means," until after the alleged retaliation occurred.[25] The District Court also rejected Mack's equal protection claim because Mack had not identified any similarly situated individuals whom prison officials treated differently.[26] As for Mack's Free Exercise and RFRA claims, which the District Court construed as "potential" claims, the District Court held that the defendants neither intentionally nor substantially burdened Mack's

---

'nearly identical' to those under the RLUIPA, the Court will address whether Mack can assert an actionable RFRA claim." (internal citations omitted)).

[23] Mack sued Stephens, Yost, and Kuhn for damages in both their individual and official capacities. He has conceded, however, that federal sovereign immunity precludes him from suing the officers for damages in their official capacities. *Mack*, No. 3:10-cv-264, ECF No. 42, at 12.

[24] *Mack*, 979 F. Supp. 2d at 648.

[25] *Id.*

[26] *Id.* at 646-47.

religious exercise, and it accordingly dismissed these claims as well.[27]

Mack moved for reconsideration under Federal Rule of Civil Procedure 59(e). The District Court denied that motion, and Mack appealed. This Court then appointed *pro bono* counsel to represent Mack.[28]

---

[27] *Id.* at 650-52.

[28] We extend our gratitude to the Duke University law students who have done a commendable job representing Mack on appeal. We also applaud Mr. Russell Taylor for his impressive performance representing Mack at oral argument.

## II. DISCUSSION[29]

There are many layers to this case. First, we will discuss Mack's First Amendment retaliation claim and the Government's corresponding defenses. With respect to this claim, we conclude that Mack has alleged sufficient facts to survive a motion to dismiss and that the defendants are not entitled to qualified immunity at this juncture. We will dismiss this claim, however, as to Defendants Yost and Kuhn.

Second, we will discuss Mack's RFRA claim. We conclude that (i) Mack can properly bring this claim against prison officers for their individual conduct, (ii) he can seek monetary damages from the officers, and (iii) his allegations sufficiently allege a substantial burden on his religious exercise.

---

[29] The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. We review *de novo* a district court's decision dismissing a complaint. *Finkelman*, 810 F.3d at 192. We note that "the standards of review for an underlying dismissal order and for the denial of a motion for reconsideration of the dismissal order are functionally equivalent, because we exercise plenary review of the dismissal order as well as of the legal questions in the denial of reconsideration." *Wiest v. Lynch*, 710 F.3d 121, 128 (3d Cir. 2013).

Third, we will turn to Mack's claim under the Free Exercise Clause. We conclude that there is no available remedy for Mack under this claim and we will accordingly dismiss it.

Finally, we will discuss Mack's equal protection claim. We conclude that this claim is insufficient to survive a motion to dismiss.

### A. First Amendment Retaliation Claim

#### i. Mack's First Amendment Retaliation Claim Against Warden Yost and Deputy Warden Kuhn Must Be Dismissed

Mack claims that he was retaliated against for orally complaining to Stephens about Roberts' and Venslosky's conduct. While Mack brings this claim against Warden Yost and Deputy Warden Kuhn as well, his complaint makes it clear that he only spoke to these defendants after the alleged retaliation occurred. There is nothing alleged from which we can infer that Yost and Kuhn were personally involved in any purported retaliation. Because plaintiffs in a *Bivens* suit "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution,"[30] Mack's First Amendment retaliation claim against Yost and Kuhn must be dismissed.

---

[30] *Bistrian v. Levi*, 696 F.3d 352, 366 (3d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

### ii. Mack Properly Exhausted His Administrative Remedies as to His First Amendment Retaliation Claim

The Prison Litigation Reform Act ("PLRA") requires prisoners to exhaust any and all prison grievance remedies before filing suit in federal court.[31] "Failure to exhaust is an affirmative defense the defendant must plead and prove."[32] The Government contends that Mack's First Amendment retaliation claim must be dismissed because Mack did not exhaust his administrative remedies. It concedes that Mack described in his formal grievance much of the alleged wrongdoing in this case. Nevertheless, it argues that because Mack's grievance never mentioned his oral complaint to Stephens about Roberts' and Venslosky's anti-Muslim conduct—the alleged protected speech that forms the basis of his retaliation claim—this claim was not properly exhausted. We find this argument unconvincing.

Under the PLRA, a grievance must be described in a level of detail sufficient to satisfy the prison's standards.[33] The Government describes the Bureau of Prison's ("BOP") procedures as "silent or vague" regarding the level of detail required in a grievance.[34] When this is the case, an inmate's

---

[31] 42 U.S.C. § 1997e(a).

[32] *Small v. Camden Cty.*, 728 F.3d 265, 268 (3d Cir. 2013).

[33] *See Jones v. Bock*, 549 U.S. 199, 218 (2007) ("The level of detail necessary in a grievance to comply with the grievance procedures will vary . . . but it is the prison's requirements . . . that define the boundaries of proper exhaustion.").

[34] Gov't Br. 15.

grievance must at least "alert[] the prison to the nature of the wrong for which redress is sought."[35] As the Supreme Court has explained, "the primary purpose of a grievance is to alert prison officials to a problem."[36] We think Mack did just that.

Before beginning the formal grievance process, Mack submitted a form requesting a written reason for his termination. In his formal grievance, Mack claimed that the response to his request was vague, and that he was "fired from [his] job for no reason."[37] He went on to explain the anti-Muslim harassment he endured at work. When his grievance was rejected, Mack explained in his appeal that the prison's proffered explanation for his termination was a "cover-up attempt."[38] He claimed that he was fired from his job for "NO real reason related to [his] work."[39]

Mack clearly alerted prison officials to his principal allegation – i.e., that he was removed from his commissary position for a pretextual reason. Even if Mack did not detail his allegedly protected speech, his grievance nonetheless notified officials that he believed he was unlawfully terminated from his work assignment as retaliation for exercising his First Amendment rights. Exhaustion merely requires "inmates [to] provide enough information about the conduct of which they complain to allow prison officials to

---

[35] *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002).

[36] *Jones*, 549 U.S. at 219.

[37] *Mack v. Yost*, No. 3:10-cv-264, ECF No. 38-3 (Defs.' Mot. to Dismiss Am. Compl.), Ex. 1b, at 2.

[38] *Id.* at 8.

[39] *Id.*

15

take appropriate responsive measures."[40]   Given this fairly lenient standard, and with no specific guidance from BOP grievance procedures, we conclude that Mack exhausted his administrative remedies before bringing his First Amendment retaliation claim.

### iii.    A *Bivens* Action Exists for Mack's First Amendment Retaliation Claim

The Government next argues that Mack cannot bring a First Amendment retaliation claim under *Bivens*.  In *Bivens*, the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's [Fourth Amendment] rights."[41] Thus, a *Bivens* action is a private cause of action for money damages implied directly from the Constitution.   The Supreme Court has extended *Bivens* to two other contexts: suits brought under the equal protection component of the Due Process Clause of the Fifth Amendment, and suits brought under the Cruel and Unusual Punishment Clause of the Eighth Amendment.[42]   Although the Supreme Court has

---

[40] *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004).

[41] *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001) (citing *Bivens*, 403 U.S. 388 (1971)); *see also Iqbal*, 556 U.S. at 675-76 ("In the limited setting where *Bivens* does apply, the implied cause of action is the federal analog to suits brought against state officials under . . . 42 U.S.C. § 1983." (internal quotation marks and citation omitted)).

[42] *Davis v. Passman*, 442 U.S. 228 (1979); *Carlson v. Green*, 446 U.S. 14 (1980).

16

never formally extended *Bivens* to First Amendment claims,[43] it seems to have occasionally assumed that First Amendment retaliation claims can proceed under *Bivens*.[44] Our Court, however, has explicitly recognized a *Bivens* action when a prisoner has been retaliated against for exercising his or her First Amendment right to petition.

In *Paton v. La Prade*,[45] we held that a *Bivens* action may be implied directly from the First Amendment.[46] Relying on this general principle, we held in *Milhouse v. Carlson*[47] that a *Bivens* action was available to an inmate who was harassed and transferred to a less desirable prison cell

---

[43] *See Reichle v. Howards*, 132 S. Ct. 2088, 2093 n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims.").

[44] *See Hartman v. Moore*, 547 U.S. 250, 256 (2006) (noting that "the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out," and stating that "[w]hen the vengeful officer is federal, he is subject to an action for damages under the authority of *Bivens*"); *see also George v. Rehiel*, 738 F.3d 562, 585 n.24 (3d Cir. 2013) (stating that "we will proceed on the assumption that there is a *Bivens* cause of action for First Amendment retaliation claims" (citing *Hartman*, 547 U.S. at 256)).

[45] 524 F.2d 862 (3d Cir. 1975).

[46] *Id.* at 870 ("[W]e believe the extension of the Bivens rule to violations of first amendment rights to be both justifiable and logical.").

[47] 652 F.2d 371 (3d Cir. 1981).

location in retaliation for filing a lawsuit against prison officials.[48]  Interpreting the *pro se* complaint as alleging a violation of the First Amendment right of access to the courts, we explained that "[p]ersons in prison, like other individuals, have the right to petition the Government for redress of grievances."[49]  This right "must be freely exercisable without hindrance or fear of retaliation."[50]  Similarly, in *Mitchell v. Horn*,[51] we held that a *Bivens* action was available to an inmate who was falsely charged with misconduct in retaliation for exercising his First Amendment petition rights.[52]  In light of these cases, we reject the Government's plea to not "extend" *Bivens* to Mack's First Amendment retaliation claim.  Our precedents make clear that, in this context, a *Bivens* action is already available.

### iv.    Mack's Oral Complaint to Stephens was Constitutionally Protected

We next address whether Mack has sufficiently pleaded a First Amendment retaliation claim.  "A prisoner alleging retaliation must show (1) constitutionally protected conduct, (2) an adverse action taken by prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the exercise of his constitutional rights and the

---

[48] *Id.* at 373-74.

[49] *Id.* at 373.

[50] *Id.* at 374.

[51] 318 F.3d 523 (3d Cir. 2003).

[52] *Id.* at 530-31.

18

adverse action taken against him."[53]  The previous panel of this Court to address Mack's retaliation claim found the latter two elements satisfied: adverse action in the form of loss of employment, and a causal connection because Mack claims he was fired one week after engaging in the allegedly protected conduct.[54]  The panel remanded to the District Court to determine whether Mack's oral grievance to Stephens was constitutionally protected under the Petition Clause, and the District Court held that it was not.  We disagree.

The Petition Clause embraces a broad range of communications, and the availability of its protections has never turned on a perceived distinction between written and oral speech.[55]  Both the Free Speech Clause and the Petition Clause protect "personal expression" – both expression generally and expression directed towards the government for the specific purpose of asking it to right a wrong.[56]  In this context, form is secondary to content.

---

[53]  *Id.* at 530 (internal quotation marks omitted and punctuation modified).

[54] *Mack*, 427 F. App'x at 72-73.

[55] *See, e.g.*, *Pearson v. Welborn*, 471 F.3d 732, 741 (7th Cir. 2006) ("Nothing in the First Amendment itself suggests that the right to petition for redress of grievances only attaches when the petitioning takes a certain form.").

[56] *See Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011) ("Beyond the political sphere, both speech and petition advance personal expression, although the right to petition is generally concerned with expression directed to the government seeking redress of a grievance.").

The Government concedes that some informal, oral, and even non-verbal expressions of grievances to the government are protected under the Petition Clause.[57] It argues, however, that an oral grievance lodged by a prisoner, in particular, should not be entitled to constitutional protection. The Government stresses that prison is a unique setting in which inmates and guards are in constant and often contentious contact with each other. In its view, holding that *every* oral complaint by a prisoner to a prison guard is constitutionally protected would provide too many opportunities for prisoners to lodge frivolous lawsuits.

While we appreciate the Government's concerns, we are not persuaded that an oral grievance should not receive constitutional protection solely because it is lodged by a prisoner as opposed to a civilian. It is well-established that inmates do not relinquish their First Amendment right to petition by virtue of being incarcerated.[58] It is also true, as the Government emphasizes, that an inmate only "retains those First Amendment rights that are not inconsistent with

---

[57] *See, e.g.*, *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 909 (1982) (boycott of merchants was protected activity under Petition Clause); *Brown v. Louisiana*, 383 U.S. 131, 136 (1966) (silent protest at racially segregated library was protected activity under Petition Clause); *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963) (peaceful march and demonstrations were protected activity under Petition Clause); *Holzemer v. City of Memphis*, 621 F.3d 512, 520-23 (6th Cir. 2010) (business owner's oral, informal request to city councilman regarding his company's ability to park at city venue was protected activity under Petition Clause).

[58] *See Turner v. Safley*, 482 U.S. 78, 84 (1987).

20

his status as a prisoner or with the legitimate penological objectives of the corrections system."[59] But under the facts alleged, there is no reason for us to think that the First Amendment rights Mack seeks to vindicate here are incompatible with his status as a prisoner.

Mack's allegations make clear that he complained to Stephens for the specific purpose of seeking redress. His complaint concerned a prison guard's conduct that the prison itself proscribes—religious harassment.[60] His complaint was not obscene or inappropriate. In fact, the Government concedes that Mack's oral grievance was "minimally disruptive and arguably valuable."[61] And Mack complained almost immediately after the harassment occurred, undermining any contention that Mack formulated some sort of plan to lodge a complaint in order to bring a frivolous lawsuit. In short, Mack's oral grievance sufficiently and timely put prison officials on notice that he was seeking redress, was conveyed to prison officials in a reasonable manner, and concerned conduct that the prison itself prohibits. Under the circumstances of this case, these factors lead us to conclude that Mack's oral grievance is entitled to constitutional protection.

Significantly, moreover, prison officials at FCI Loretto may have actually encouraged inmates to communicate their concerns orally. BOP procedures require inmates to present an issue "informally to staff" before filing a formal grievance,

---

[59] *Pell v. Procunier*, 417 U.S. 817, 822 (1974).

[60] *See* 28 C.F.R. § 548.15.

[61] Gov't Br. 25.

21

and require wardens to "establish procedures to allow for the informal resolution of inmate complaints."[62] FCI Loretto's inmate handbook explains that, "Executive Staff and Department Heads regularly stand mainline at the lunch meal *and you are encouraged to bring legitimate concerns to their attention.*"[63] We can reasonably assume that this is why Mack approached Stephens and Yost in person during his lunch hour. It would be illogical to allow prison officials to retaliate against Mack for his oral complaint if FCI Loretto encourages the type of informal resolution that Mack attempted.

To our knowledge, only one other circuit has addressed this specific issue. In *Pearson v. Welborn*,[64] the Seventh Circuit held that an inmate's oral complaints to prison guards about the use of shackles in group therapy and the denial of yard time were constitutionally protected under the Petition Clause.[65] The court explained that "[n]othing in the First Amendment itself suggests that the right to petition for redress of grievances only attaches when the petitioning takes a specific form."[66] And while "certain types of 'petitioning' would be obviously inconsistent with

---

[62] *See* 28 C.F.R. 542.13(a).

[63] U.S. Dep't of Justice, Fed. Bureau of Prisons, FCI Loretto Inmate Admission and Orientation Handbook, 14 (May 2015), *available at* https://www.bop.gov/locations/institutions/lor/LOR_aohandbook.pdf (emphasis added).

[64] 471 F.3d 732.

[65] *Id.* at 741.

[66] *Id.*

22

imprisonment (marches or group protests, for example),"[67] the inmate's oral complaints in that case did not fall into that category. We find the Seventh Circuit's rationale to readily apply to the circumstances of this case.[68]

For these reasons, we conclude that Mack's oral grievance to Stephens regarding the anti-Muslim harassment he endured at work constitutes protected activity under the First Amendment.[69]

---

[67] *Id.*

[68] *See also Williams v. Wahner*, 731 F.3d 731, 734 (7th Cir. 2013) ("Many prisoners can explain themselves orally but not in writing. They may be illiterate in English, or they may simply be such poor writers that they can't convey their thoughts other than orally.").

[69] The Government urges us to impose a public concern requirement on oral grievances in the prisoner-work context. In the public employment context, public employees who assert First Amendment free speech or right to petition claims against their government employers must show that their speech addressed a matter of public concern. *See Connick v. Myers*, 461 U.S. 138, 145-48 (1983); *Guarnieri*, 564 U.S. at 398-99. We have explicitly stated, however, that the rationale for the public/private concern distinction in the public employment context does not apply in other contexts, including prison settings. *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 284 (3d Cir. 2004). Several other circuits have held the same. *See, e.g.*, *Watkins v. Kasper*, 599 F.3d 791, 795 (7th Cir. 2010); *Friedl v. City of New York*, 210 F.3d 79, 87 (2d Cir. 2000).

### v. Roberts, Venslosky, and Stephens are Not Entitled to Qualified Immunity

The remaining question we must answer with respect to Mack's First Amendment retaliation claim is whether Roberts, Venslosky, and Stephens are entitled to qualified immunity.[70] "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[71] To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[72] "The dispositive question is whether the violative nature of *particular* conduct is clearly established."[73] That is not to say that qualified immunity applies "unless the very action in question has previously been held unlawful," only that "in light of pre-existing law the unlawfulness must be apparent."[74]

---

[70] Because the District Court found no First Amendment retaliation violation, it did not address whether the officers were entitled to qualified immunity. As this issue is purely a question of law at this stage, we address it in the first instance.

[71] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[72] *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

[73] *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (internal quotation marks omitted).

[74] *Anderson*, 483 U.S. at 640.

We have long recognized that prisoners have a right to be free from retaliation for exercising their First Amendment right to petition. Indeed, "[r]etaliating against a prisoner for the exercise of [*any* of] his constitutional rights is unconstitutional."[75] Retaliatory termination is clearly unlawful, both inside and outside the prison context.[76] The fact that the officers retaliated against Mack before he reduced his grievance to writing is inconsequential. While we have never held before today that a prisoner's oral grievance, in particular, is constitutionally protected, we have certainly never suggested that such a grievance is entitled to lower protection than one reduced to writing. And there are myriad cases outside the prison context that make no distinction between oral and written grievances.[77] Thus we have little doubt concluding that prisoners' oral grievances are indeed entitled to constitutional protection. A reasonable official in the prison officers' position should therefore have known that retaliating against Mack for exercising his right to petition, whether in the form of an oral or written grievance, was unlawful.[78] This is especially so if the prison actually encourages its inmates to communicate their concerns orally.

---

[75] *Bistrian*, 696 F.3d at 376.

[76] Although prisoners have no liberty or property interest in prison employment, *James v. Quinlan*, 866 F.2d 627, 629-30 (3d Cir. 1989), it is unlawful to terminate a prisoner's employment in retaliation for them having exercised a constitutional right, *see Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001).

[77] *See supra* note 57.

[78] *See, e.g.*, *Holzemer*, 621 F.3d at 529 ("[N]o reasonable officer could believe that retaliation for the exercise of a First

25

Because we conclude that Mack has sufficiently stated a First Amendment retaliation claim, and that the remaining defendants are not entitled to qualified immunity, we will vacate the District Court's dismissal of this claim and remand to the District Court for further proceedings.

## B.      Religious Freedom and Restoration Act Claim

We next address Mack's claim that the prison officers' anti-Muslim conduct violated RFRA, which prohibits the government from "substantially burden[ing] a person's exercise of religion."[79]  Mack brings this claim against only Officers Roberts and Venslosky in their individual capacities. He alleges that their anti-Muslim harassment and hostility towards him caused him to refrain from praying at work. These allegations are sufficient to state a claim under RFRA.

### i.      RFRA's Remedial Scope

Mack's claim raises two threshold questions: (1) whether RFRA is the appropriate vehicle for relief when the challenged government action is an official's individual conduct, as opposed to a law, regulation, or policy, or conduct pursuant to such; and (2) whether RFRA allows a litigant to

---

Amendment right is permitted when that exercise takes the form of speech but is not permitted when the same expression is written."); *Pearson*, 471 F.3d at 742 ("[W]e think a reasonable public official in [the defendant's] position would understand that retaliating against a prisoner on the basis of his [oral] complaints about prison conditions is unlawful.").

[79] 42 U.S.C. § 2000bb-1(a).

sue a government official for money damages. We answer both questions in the affirmative.

Congress enacted RFRA "in order to provide very broad protection for religious liberty."[80] RFRA prohibits the "Government" from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability," unless the "Government" can "demonstrate[] that application of the burden to the person— (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."[81] The statute explicitly provides a private cause of action against the "government" for "appropriate relief."[82] "Government" is defined as "includ[ing] a branch, department, agency, instrumentality, and *official* (*or other person* acting under color of law) of the United States."[83]

The plain language of RFRA establishes that a plaintiff may bring claims for "appropriate relief" against "persons," either federal "officials" or those acting under color of federal law, whose individual conduct substantially burdens one's religious exercise. Nothing in the text of RFRA suggests that the "official" or "person" must be acting in furtherance of an official policy. This interpretation is consistent with the

---

[80] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014).

[81] 42 U.S.C. § 2000bb-1(a)-(b).

[82] *Id.* § 2000bb-1(c).

[83] *Id.* § 2000bb-2(1) (emphasis added).

Supreme Court's view of RFRA's "[s]weeping coverage."[84] According to the Court, RFRA "intru[des] at every level of government, displacing laws and *prohibiting official actions* of almost every description and regardless of subject matter," and its restrictions apply to "every agency *and official* of the Federal Government[]."[85]

Our conclusion that RFRA permits suits against individual officers for their *ultra vires* acts is reinforced by the similarities between RFRA and 42 U.S.C. § 1983. Section 1983 creates a private cause of action against "person[s]" acting "under color of [state law]" whose individual conduct violates a plaintiff's constitutional rights.[86] Under § 1983, state officials or private persons acting under color of state law may be held liable for their personal unlawful conduct, irrespective of the existence or non-existence of an unconstitutional law, regulation, or policy. Because RFRA's definition of "government" tracks the language of § 1983, it is reasonable to assume that liability can be imposed similarly under both statutes. Indeed, several of our sister circuits have concluded that this word choice was not coincidental and that Congress intended for courts to borrow concepts from § 1983 jurisprudence when construing

---

[84] *City of Boerne v. Flores*, 521 U.S. 507, 532 (1997).

[85] *Id.* In fact, it is this "sweeping coverage" that led the Court to invalidate RFRA as applied to the states for exceeding Congress's enforcement power under the Fourteenth Amendment. *Id.* at 532-34.

[86] 42 U.S.C. § 1983.

28

RFRA.[87]  As the Ninth Circuit has explained, "[w]hen a legislature borrows an already judicially interpreted phrase from an old statute to use in a new statute, it is presumed that the legislature intends to adopt not merely the old phrase but the judicial construction of that phrase."[88]  Under this presumption, RFRA, like § 1983, provides for relief from individual government conduct whether or not it is undertaken pursuant to an official rule or policy.  Thus, contrary to the Government's contentions, Mack's failure to challenge a prison policy or regulation does not defeat his RFRA claim.

We also read RFRA as providing for monetary relief from officers who commit unlawful conduct.[89]  Under

---

[87] *See, e.g.*, *Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 738 (7th Cir. 2015), *cert. dismissed*, 136 S. Ct. 581 (2015) (applying § 1983 "under color of" law analysis to determine whether private defendant was the "government" for purposes of RFRA); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834-35 (9th Cir. 1999) (same).

[88] *Sutton*, 192 F.3d at 834-35 (quoting *Long v. Director, Office of Workers' Comp. Programs*, 767 F.2d 1578, 1581 (9th Cir. 1985)).

[89] Although we have never held before today that damages suits are available under RFRA, we and several other circuits have assumed this to be the case. *See, e.g.*, *Jama v. Esmor Corr. Servs., Inc.*, 577 F.3d 169, 174 (3d Cir. 2009) (assuming RFRA damages were available against corporate and individual defendants when reviewing attorney fee award); *Mack v. O'Leary*, 80 F.3d 1175, 1177 (7th Cir. 1996), *cert. granted, judgment vacated on other grounds*, 522 U.S.

RFRA's judicial relief provision, persons whose religious exercise has been substantially burdened by the government may "obtain appropriate relief against a government."[90] The statute does not define "appropriate relief." Hence we look to the traditional presumption articulated in *Franklin v. Gwinnett County Public Schools*[91] that "any appropriate relief" is available unless Congress expressly indicates otherwise.[92]

---

801, *district court partially aff'd*, 1998 WL 416151 (7th Cir. 1998) (assuming that prisoner was entitled to sue prison officials for damages under RFRA because the statute defines "government" to include government employees); *Brown v. Hot, Sexy and Safer Prods., Inc.*, 68 F.3d 525, 538 (1st Cir. 1995), *abrogation on other grounds recognized by Martinez v. Cui*, 608 F.3d 54, 63-64 (1st Cir. 2010) (assuming that damages were available under RFRA in concluding that RFRA does not apply retroactively to plaintiffs' claim for damages).

[90] 42 U.S.C. § 2000bb-1(c).

[91] 503 U.S. 60 (1992).

[92] Because Mack brings his RFRA claim against only Officers Roberts and Venslosky in their individual capacities, the federal government's sovereign immunity to suits for damages is irrelevant here. *Cf. Davila v. Gladden*, 777 F.3d 1198, 1210 (11th Cir. 2015), *cert. denied sub nom. Davila v. Haynes*, 136 S. Ct. 78 (2015) ("Congress did not unequivocally waive its sovereign immunity in passing RFRA. RFRA does not therefore authorize suits for money damages against officers in their official capacities.").

In *Franklin*, the Supreme Court considered whether Title IX of the Education Amendments of 1972, which the Court previously held creates an implied right of action, provides for damages relief. The Court applied the longstanding presumption that, "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute."[93] "Finding no express congressional intent to limit the remedies available under the implied right of action, the Court held that compensatory damages were available" under Title IX.[94]

The same presumption applies here – more so, we think, because Congress expressly stated that a claimant may obtain "appropriate relief" against the government – the exact language used in *Franklin*. Congress enacted RFRA one year after *Franklin* was decided and was therefore well aware that "appropriate relief" means what it says, and that, without expressly stating otherwise, all appropriate relief would be available.[95] Of course, the relief has to be appropriate vis-à-vis the purposes of the statute. As we have explained, the

---

[93] *Franklin*, 503 U.S. at 70-71.

[94] *Sossamon v. Texas*, 563 U.S. 277, 288 (2011) (citing *Franklin*, 503 U.S. at 73).

[95] *See Availability of Money Damages Under the Religious Freedom and Restoration Act*, 18 Op. O.L.C. 180, 183 (1994) ("Because RFRA's reference to 'appropriate relief' does not clearly exclude money damages, there is a strong argument that under the *Franklin* standard money damages should be made available to RFRA plaintiffs in suits against non-sovereign entities.").

purposes of RFRA are to provide broad religious liberty protections. We see no reason why a suit for money damages against a government official whose conduct violates RFRA would be inconsistent with those purposes.

Our conclusion is bolstered, again, by the similarities between RFRA and § 1983, which has long provided for money damages against state officials sued in their individual capacities.[96] We are unmoved, however, by the similarities in the text of RFRA and its sister statute, RLUIPA, which we have held does not provide for damages against state officials sued in their individual capacities.[97] Although the judicial relief provision in RLUIPA mirrors that in RFRA,[98] RLUIPA was enacted pursuant to Congress's powers under the Spending Clause, thereby allowing Congress to impose certain conditions, such as civil liability, on the recipients of federal funds, such as state prison institutions.[99] Because state officials are not direct recipients of the federal funds, and thus would have no notice of the conditions imposed on them, they cannot be held individually liable under RLUIPA.[100] RFRA, by contrast, was enacted pursuant to

---

[96] *United States ex rel. Jones v. Rundle*, 453 F.2d 147, 150 n.11 (3d Cir. 1971) ("Money damages may constitute appropriate relief in Section 1983 cases." (citing *Monroe v. Pape*, 365 U.S. 163, 187 (1961))).

[97] *See Sharp v. Johnson*, 669 F.3d 144, 154-55 (3d Cir. 2012).

[98] *See* 42 U.S.C. § 2000cc-2(a).

[99] *Sharp*, 669 F.3d at 154.

[100] *Id.* at 154-55.

Congress's powers under the Necessary and Proper Clause and thus does not implicate the same concerns.[101]

For these reasons, we conclude that federal officers who violate RFRA may be sued in their individual capacity for damages.

### ii. Mack Has Alleged a Substantial Burden on His Religious Exercise

We now address the merits of Mack's RFRA claim. To establish a prima facie case under RFRA, Mack must allege that the government (1) substantially burdened (2) a sincere (3) religious exercise.[102] The Government does not dispute the sincerity of Mack's exercise of his religious beliefs. Thus, the only issue is whether Mack has sufficiently alleged a substantial burden on his religious exercise.

Although RFRA does not explicitly define the term "substantial burden," we have explained that a substantial burden exists where (1) "a follower is forced to choose

---

[101] We are also unmoved by the conclusion of one district court that RFRA does not provide for damages against individual officers because that form of relief was unavailable under the Supreme Court jurisprudence that RFRA sought to restore. *See Tanvir v. Lynch*, 128 F. Supp. 3d 756, 777-78 (S.D.N.Y. 2015). As noted by the Supreme Court in *Hobby Lobby*, RFRA provides "even broader protection for religious liberty than was available" previously. 134 S. Ct. at 2761 n.3.

[102] *See Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418, 428 (2006).

between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit;" or (2) "the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs."[103]

Mack argues that the combination of Officer Roberts' anti-Muslim harassment and Officer Venslosky's tacit approval created a hostile work environment that caused him to stop praying at work. We can reasonably infer from these allegations that Mack previously was in the practice of praying at work before the harassment took place. Although Mack concedes that the officers did not directly command him to cease praying, a burden can be "substantial" even if it involves indirect coercion to betray one's religious beliefs.[104] Because we think the indirect pressure the officers placed on Mack may very well have substantially burdened his religious exercise, we conclude that his allegations are sufficient to survive a motion to dismiss. We will therefore vacate the District Court's dismissal of Mack's RFRA claim and remand to the District Court for further proceedings.

---

[103] *Washington v. Klem*, 497 F.3d 272, 280 (3d Cir. 2007). Although *Klem* examined the definition of "substantial burden" in the context of RLUIPA, the two statutes are analogous for purposes of the substantial burden test.

[104] *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988) ("[I]ndirect coercion or penalties on the free exercise of religion, not just outright prohibitions, are subject to scrutiny under the First Amendment.").

### C.    Free Exercise Claim

Next, we address Mack's claim that the prison officers' anti-Muslim conduct violated his First Amendment right to freely exercise his religion.[105]  Mack seeks only monetary relief, asserting that he has an implied right of action for damages pursuant to *Bivens*.  But neither the Supreme Court nor this Court has ever extended *Bivens* to Free Exercise claims.  In view of RFRA's broad protections for religious liberty, we decline to do so here.

The Supreme Court in *Wilkie v. Robbins*[106] set forth a two-part framework for considering whether to extend *Bivens* to new contexts.  First, we ask whether there is an alternative remedial scheme available to the plaintiff and, if so, whether the existing scheme "convinc[es]" us to refrain from providing a new, freestanding damages remedy.[107]  If not, then we consider whether "special factors" counsel hesitation in creating a new cause of action for damages.[108]  "Special factors" typically relate to the question of who should decide whether and how a remedy should be provided.[109]  We must keep in mind, however, that "'Congress is in a far better

---

[105] The Free Exercise Clause of the First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise [of religion.]"  U.S. Const. amend. I, cl. 1.

[106] 551 U.S. 537 (2007).

[107] *Id.* at 550.

[108] *Id.*

[109] *See Bush v. Lucas*, 462 U.S. 367, 380 (1983).

position than a court to evaluate the impact of a new species of litigation' against those who act on the public's behalf."[110]

Mack's argument fails at step one because the religious liberty protections provided by RFRA strongly militate against creating a *Bivens* action for Free Exercise claims. As detailed in our preceding section, RFRA provides Mack with a comprehensive remedial scheme for violations of substantial burdens on his religious exercise. Indeed, "Congress enacted RFRA in order to provide greater protection for religious exercise than is available under the First Amendment."[111] Under RFRA, burdens on religious exercise need not be intentional, only substantial. And, as we have explained, RFRA provides claimants with all "appropriate relief" for such violations. Given this alternative remedial scheme, we can conceive no adequate justification for extending *Bivens* to Free Exercise claims. We will therefore affirm the District Court's dismissal of Mack's Free Exercise claim.

### D.    Equal Protection Claim

Finally, we address Mack's equal protection claim under the Fifth Amendment.[112] To state an equal protection

---

[110] *Wilkie*, 551 U.S. at 562 (quoting *Bush*, 462 U.S. at 389).

[111] *Holt v. Hobbs*, 135 S. Ct. 853, 859-60 (2015).

[112] Although the Fifth Amendment does not contain an equal protection clause, the Supreme Court has construed the Fifth Amendment's Due Process Clause as containing an equal protection guarantee. *See Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 616 (1991). Accordingly, "Fifth Amendment equal protection claims are examined under the same principles that apply to such claims under the

claim, Mack must allege that he was treated differently than other similarly situated inmates, and that this different treatment was the result of intentional discrimination based on his membership in a protected class, such as religious affiliation.[113]

Mack did not specifically raise an equal protection claim in his amended complaint, though he argued in his first complaint that he was denied equal protection of prison regulations and/or policies.[114]  He elaborated in his opposition to the defendants' motion to dismiss that he was "targeted" and "singled out . . . due to his faith, and that no other inmate who[] worked in the commissary was treated with hostility because of their religion."[115]  On appeal, Mack contends that these allegations, construed liberally, support two plausible inferences: (1) that the defendants terminated him from his work assignment because of his religion, and (2) that the defendants harassed him because of his religion.

Even construing his pleadings liberally, we are not convinced that Mack has sufficiently stated a claim for discriminatory termination based on his religion.  His allegations certainly make out the claim that he was fired because he complained of the anti-Muslim harassment against him: "Plaintiff then stated . . . '[t]he only reason I'm being

---

Fourteenth Amendment."  *Abdul-Akbar v. McKelvie*, 239 F.3d 307, 317 (3d Cir. 2001).

[113] *See Hassan v. City of New York*, 804 F.3d 277, 294, 298 (3d Cir. 2015).

[114] Compl. 1.

[115] *Mack*, No. 3:10-cv-264, ECF No. 42, at 5.

fired is because I spoke to [Defendant] Mr. Stevens [sic] about what Mr. Roberts did and said to me.'"[116] But we find it much harder to construe his pleadings as making out the claim that he was fired *because* he is Muslim, or that the officers' anti-Muslim animus played a role in their decision to fire him.

Mack's discriminatory harassment claim fares no better. Mack alleges two instances of discriminatory conduct by Officer Roberts – first placing the Islam-offensive sticker on his back, and then shouting that "there is no good Muslim except a dead Muslim." While these instances certainly provide strong evidence of Roberts' anti-Muslim animus, they do not, standing alone, state an equal protection violation.[117] We will therefore affirm the District Court's dismissal of Mack's equal protection claim.

## III. CONCLUSION

At first blush, this case may seem to lack merit. But Mack's allegations, taken as true, raise legitimate concerns about how he was treated in prison. This case has also raised

---

[116] Am. Compl. ¶ 23. *See id.* ¶ 35 (alleging that Roberts and Venslosky "retaliate[d] against [Mack] by firing him from the commissary job, because of plaintiff exercising his right to seek redress by way of (oral) grievance").

[117] In other words, the behavior that Mack sets forth in his complaint – i.e., two instances of anti-Muslim harassment – does not force us to confront whether and to what extent persistent harassment may make out a claim for an equal protection violation. We are confident that two instances of harassment are insufficient.

several unsettled issues about how or if a litigant such as Mack may obtain relief. For reasons we have explored, we conclude that Mack's First Amendment retaliation and RFRA claims may proceed, and his First Amendment Free Exercise and Fifth Amendment equal protection claims may not. We will therefore affirm in part, vacate in part, and remand to the District Court for further proceedings consistent with this Opinion.

*Mack v. Yost, et al.*,

No. 14-2738

_____

ROTH, <u>Circuit Judge</u>, concurring in part and dissenting in part:

I respectfully dissent from the holding of the majority in Part II A of its opinion that Mack has stated a First Amendment retaliation claim against defendants Roberts and Venslosky. I believe that, with regard to a retaliation claim made by the inmate of a prison, oral complaints should not be considered protected conduct under the First Amendment. Oral complaints, unlike written grievances, do not create a record. In fact, oral complaints may generate uncertainty about the content, or even the existence, of the grievance. In addition, a written complaint better provides notice to prison officials about the nature of the grievance and the individuals implicated in it.[1] This written notice is important because, in the prison setting, inmates constantly interact with multiple prison officials, and "virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act."[2]

_____

[1] *Johnson v. Johnson*, 385 F.3d 503, 526-27 (5th Cir. 2004) (letters and forms filed by inmate provided prison officials notice of the substantial risk that inmate faced for his safety).
[2] *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (internal quotations omitted).

1

Drawing a line between oral, informal complaints and written, formal grievances reflects some of the difficulties in the administration of prisons and in the handling inmate grievances. Congress had these concerns in mind when it enacted the Prison Litigation Reform Act, which directs inmates to comply with the correctional institution's policy on grievance resolution.[3] The institution's policy here, found in the Loretto inmate handbook, directs that inmates file *written* grievances; the handbook makes no mention of oral complaints.

As we set out above, the logic behind encouraging written rather than oral complaints is obvious when viewed in the context of effective administration of the prison grievance system. The majority's conclusion that an oral, informal complaint constitutes protected conduct under the First Amendment renders the administration of grievance procedures more difficult and risks vastly increasing the number of prisoner lawsuits involving retaliation claims.

Furthermore, our precedent is clear that *written* grievances do constitute protected conduct under the First Amendment. In *Milhouse*, we held that the inmate stated a claim that he was subjected to a conspiratorially planned series of disciplinary actions as retaliation for initiating a civil rights suit against prison officials.[4] In *Bistrian*, we concluded that the inmate stated a claim that prison officials confined him in the segregated housing unit in retaliation for written complaints he filed through his attorney.[5] A written

---

[3] 42 U.S.C. § 1997e(a) (2000).
[4] *Milhouse v. Carlson*, 652 F.2d 371, 373-74 (3d Cir. 1981).
[5] *Bistrian v. Levi*, 696 F.3d 352, 362-63 (3d Cir. 2012).

grievance protects the prisoner as well as the prison administration.

In conclusion, considering the policy behind the Prison Litigation Reform Act's requirement that a grievance be in writing and that it comply with the correctional institution's policy, along with the Loretto inmate handbook's requirement that grievances be in writing, I find that these requirements are "legitimate penological objectives of the corrections system."[6]

I consider, therefore, that it is not a violation of a prisoner's First Amendment rights to require that any grievance that would form the basis for a retaliation claim be in writing and to refuse to find a retaliation claim arising from an oral complaint. Thus, I would affirm the District Court's dismissal of the First Amendment retaliation claim.

I do, however, join the majority in its holding in Part II B that the allegations of the RFRA violation survive a motion to dismiss and that that claim should be remanded to the District Court. I also join the majority in its holding in Part II C and D that the District Court's dismissal of the First Amendment Free Exercise claim and the RLUIPA claim be affirmed.

---

[6] *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (holding that in the First Amendment context "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.").