16-1176
Tanvir v. Tanzin

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2016

(Argued: March 1, 2017                    Decided: May 2, 2018
                                          Amended: June 25, 2018)

Docket No. 16-1176

_____

MUHAMMAD TANVIR, JAMEEL ALGIBHAH,
NAVEED SHINWARI,

                              *Plaintiffs-Appellants*,

                    v.

FNU TANZIN, Special Agent, FBI; SANYA GARCIA, Special
Agent, FBI; JOHN LNU, Special Agent, FBI; FRANCISCO
ARTUSA, Special Agent, FBI; JOHN C. HARLEY III, Special
Agent, FBI; STEVEN LNU, Special Agent, FBI; MICHAEL
LNU, Special Agent, FBI; GREGG GROSSOEHMIG, Special
Agent, FBI; WEYSAN DUN, Special Agent in Charge, FBI;
JAMES C. LANGENBERG, Assistant Special Agent in Charge,
FBI; JOHN DOE #1, Special Agent, FBI; JOHN DOE #2, Special
Agent, FBI; JOHN DOE #3, Special Agent, FBI; JOHN DOE #4,
Special Agent, FBI; JOHN DOE #5, Special Agent, FBI; JOHN
DOE #6, Special Agent, FBI,

*Defendants-Appellees.*[1]

_____

Before: KATZMANN, *Chief Judge*, POOLER and LYNCH, *Circuit Judges*.

Plaintiffs-Appellants Muhammad Tanvir, Jameel Algibah, and Naveed Shinwari ("Plaintiffs") appeal from a February 17, 2016 final judgment of the United States District Court for the Southern District of New York (Abrams, *J.*), dismissing their complaint against senior federal law enforcement officials and 25 named and unnamed federal law enforcement officers. The complaint alleged, inter alia, that in retaliation for Plaintiffs' refusal to serve as informants, federal officers improperly placed or retained Plaintiffs' names on the "No Fly List," in violation of Plaintiffs' rights under the First Amendment and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* ("RFRA").

The complaint sought (1) injunctive and declaratory relief against all defendants in their official capacities for various constitutional and statutory violations, and (2) compensatory and punitive damages from federal law enforcement officers in their individual capacities for violations of their rights under the First Amendment and RFRA. After the parties agreed to stay the

_____

[1] The Clerk of Court is respectfully directed to amend the official caption in this case to conform with the caption above.

2

official capacity claims, the district court dismissed Plaintiffs' individual capacity claims. As relevant here, the district court held that RFRA does not permit the recovery of money damages against federal officers sued in their individual capacities. Plaintiffs appeal that RFRA determination only.

Because we disagree with the district court, and hold that RFRA permits a plaintiff to recover money damages against federal officers sued in their individual capacities for violations of RFRA's substantive protections, we reverse the district court's judgment and remand for further proceedings.

REVERSED and REMANDED.

_____

RAMZI KASSEM, CLEAR Project, Main Street Legal Services, Inc., City University of New York School of Law (Naz Ahmad, *on the brief*), Long Island City, NY, *for Plaintiffs-Appellants*.

Jennifer R. Cowan, Erol Gulay, Sandy Tomasik, Debevoise & Plimpton LLP, New York, NY, *for Plaintiffs-Appellants*.

Shayana D. Kadidal, Baher Azmy, Center for Constitutional Rights, New York, NY, *for Plaintiffs-Appellants*.

ELLEN BLAIN, Assistant United States Attorney (Sarah S. Normand, Benjamin H. Torrance, Assistant United States Attorneys, *on the brief*), *for* Joon H. Kim, Acting United States Attorney for the Southern District of New York, New York, NY, *for Defendants-Appellees*.

POOLER, *Circuit Judge*:

Plaintiffs-Appellants Muhammad Tanvir, Jameel Algibah, and Naveed Shinwari ("Plaintiffs") appeal from a February 17, 2016 final judgment of the United States District Court for the Southern District of New York (Abrams, *J.*), dismissing their complaint against senior federal law enforcement officials and 25 named and unnamed federal law enforcement officers. As relevant here, the complaint alleged that, in retaliation for Plaintiffs' refusal to serve as informants, federal officers improperly placed or retained Plaintiffs' names on the "No Fly List," in violation of Plaintiffs' rights under the First Amendment and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* ("RFRA").

The complaint sought (1) injunctive and declaratory relief against all defendants in their official capacities for various constitutional and statutory violations, and (2) compensatory and punitive damages from federal law enforcement officers in their individual capacities for violations of their rights

4

under the First Amendment and RFRA. As relevant here, the district court held that RFRA does not permit the recovery of money damages against federal officers sued in their individual capacities. Plaintiffs appeal that RFRA determination only.

Because we disagree with the district court, and hold that RFRA permits a plaintiff to recover money damages against federal officers sued in their individual capacities for violations of RFRA's substantive protections, we reverse the district court's judgment and remand for further proceedings.

## BACKGROUND

On appeal from the district court's dismissal of Plaintiffs' complaint, we "accept[] as true factual allegations in the complaint, and draw[] all reasonable inferences in the favor of the plaintiffs." *Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 227 (2d Cir. 2012).

**I.     Relevant Factual and Procedural Background**

Plaintiffs are Muslim men who reside in New York or Connecticut. Each was born abroad, immigrated to the United States early in his life, and is now lawfully present here as either a U.S. citizen or as a permanent resident. Each has family remaining overseas.

Plaintiffs assert that they were each approached by federal agents and asked to serve as informants for the FBI. Specifically, Plaintiffs were asked to gather information on members of Muslim communities and report that information to the FBI.[2] In some instances, the FBI's request was accompanied with severe pressure, including threats of deportation or arrest; in others, the request was accompanied by promises of financial and other assistance. Regardless, Plaintiffs rebuffed those repeated requests, at least in part based on their sincerely-held religious beliefs. In response to these refusals, the federal agents maintained Plaintiffs on the national "No Fly List," despite the fact that Plaintiffs "do[] not pose, ha[ve] never posed, and ha[ve] never been accused of posing, a threat to aviation safety." App'x at 74, 84, 92 ¶¶ 68, 118, 145.

According to the complaint, Defendants "forced Plaintiffs into an impermissible choice between, on the one hand, obeying their sincerely held religious beliefs and being subjected to the punishment of placement or retention

_____

[2] Plaintiffs assert that they were caught up in a broader web of federal law enforcement mistreatment of American Muslims. They allege that, following the tragic attacks of September 11, 2001, "the FBI has engaged in widespread targeting of American Muslim communities for surveillance and intelligence-gathering." App'x at 66 ¶ 36. These law enforcement practices included "the aggressive recruitment and deployment of informants . . . in American Muslim communities, organizations, and houses of worship." *Id.*

on the No Fly List, or, on the other hand, violating their sincerely held religious beliefs in order to avoid being placed on the No Fly List or to secure removal from the No Fly List." App'x at 109 ¶ 210. Plaintiffs allege that this dilemma placed a substantial burden on their exercise of religion.

Additionally, Defendants' actions caused Plaintiffs to suffer emotional distress, reputational harm, and economic loss. As a result of Defendants' actions placing and retaining Plaintiffs on the "No Fly List," Plaintiffs were prohibited from flying for several years. Such prohibition prevented Plaintiffs from visiting family members overseas, caused Plaintiffs to lose money they had paid for plane tickets, and hampered Plaintiffs' ability to travel for work.[3]

A.      The "No Fly List"

In an effort to ensure aircraft security, Congress directed the Transportation Security Administration ("TSA") to establish procedures for notifying appropriate officials of the identity of individuals "known to pose, or

---

[3] One Plaintiff, for example, had to quit a job as a long-haul trucker because that job required him to fly home after completing his route, while another declined temporary employment in Florida due to these travel restrictions. These same restrictions barred another Plaintiff from traveling to Pakistan to visit his ailing mother, and rendered yet another Plaintiff unable to see his wife or daughter in Yemen for many years.

7

suspected of posing, a risk of air piracy or terrorism or a threat to airline or passenger safety." 49 U.S.C. § 114(h)(2). TSA was further instructed to "utilize all appropriate records in the consolidated and integrated terrorist watchlist maintained by the Federal Government" to perform a passenger prescreening function. 49 U.S.C. § 44903(j)(2)(C)(ii).

The "No Fly List" is one such terrorist watchlist and is part of a broader database developed and maintained by the Terrorist Screening Center ("TSC"), which is administered by the FBI. The TSC's database contains information about individuals who are known or reasonably suspected of being involved in terrorist activity. The TSC shares the names of individuals on the "No Fly List" with federal and state law enforcement agencies, the TSA, airline representatives, and cooperating foreign governments.

Plaintiffs allege that federal law enforcement and intelligence agencies may "nominate" an individual for inclusion in the TSC's database, including the "No Fly List," if there is "reasonable suspicion" that the person is a "known or suspected terrorist." App'x at 68 ¶ 41. In order for a nominated individual to be added to the "No Fly List," there must be additional "derogatory information" showing that the individual "pose[s] a threat of committing a terrorist act with

8

respect to an aircraft." App'x at 68 ¶ 42. Any person placed on the "No Fly List" is barred from boarding a plane that starts in, ends in, or flies over the United States.[4]

Plaintiffs claim that the federal agents named in the amended complaint "exploited the significant burdens imposed by the No Fly List, its opaque nature and ill-defined standards, and its lack of procedural safeguards, in an attempt to coerce Plaintiffs into serving as informants within their American Muslim communities and places of worship." App'x at 59 ¶ 8. When rebuffed, the federal agents "retaliated against Plaintiffs by placing or retaining them on the No Fly List." *Id.*

---

[4] In their amended complaint, Plaintiffs decry the secrecy around the "No Fly List," alleging that there is little public information about its size, the criteria for inclusion, the standards for "derogatory information," or the adequacy of its procedural safeguards. Upon information and belief, Plaintiffs assert that the "No Fly List" burgeoned from 3,400 individuals in 2009 to over 21,000 individuals by February 2012.

*B.*    *Tanvir: An Illustrative Story*

As did the district court below, we present Tanvir's story as illustrative of Plaintiffs' experiences.

At the time the complaint was filed, Tanvir was a lawful permanent resident living in Queens, New York. Tanvir's wife, son, and parents remain in Pakistan. In February 2007, Tanvir alleged that FBI Special Agents FNU Tanzin and John Doe 1 approached him at work and questioned him for 30 minutes about an acquaintance who allegedly entered the United States illegally. Two days later, Agent Tanzin called Tanvir and asked whether he had anything he "could share" with the FBI about the American Muslim community. App'x at 74 ¶ 70. Tanvir said he told Agent Tanzin that he knew nothing relevant to law enforcement.

In July 2008, after returning home from a trip to Pakistan to visit his family, Tanvir was detained by federal agents for five hours at JFK Airport. His passport was confiscated and he was told he could retrieve it on January 28, 2009, nearly six months later. Two days prior to that appointment, Agent Tanzin and FBI Special Agent John Doe 2 visited Tanvir at his new workplace and asked him to come to the FBI's Manhattan field office. Tanvir agreed.

10

At the FBI field office, the federal agents questioned Tanvir for about an hour. The agents asked Tanvir whether he was aware of Taliban training camps near his home village in Pakistan and whether he had Taliban training. Tanvir denied knowledge of the camps or participation in such training.

After the questioning, Agents Tanzin and John Doe 2 complimented Tanvir and asked him to work as an informant for the FBI in Pakistan or Afghanistan. Tanvir alleged that they offered him various incentives, including facilitating visits for his family to the United States and paying for his parents' religious pilgrimage. Despite the offer, Tanvir declined, stating that he did not want to be an informant. The agents persisted, threatening Tanvir that his passport would not be returned and he would be deported if he failed to cooperate. Tanvir implored the agents not to deport him. At the meeting's end, the agents asked Tanvir to reconsider and to keep their conversation private.

The next day, Agent Tanzin asked Tanvir if he had reconsidered and would become an informant. Agent Tanzin threatened Tanvir with deportation if he did not cooperate. Again, Tanvir declined.

On January 28, 2009, Tanvir recovered his passport from Department of Homeland Security ("DHS") officers at JFK Airport without incident. The DHS

11

officers said his passport was withheld for an investigation, but that the investigation was complete. Nevertheless, the next day, Agent Tanzin called Tanvir and said that he asked for the release of Tanvir's passport because Tanvir was "cooperative" with the FBI. App'x at 77 ¶ 81.

The FBI agents continued to pressure Tanvir to work as an informant over the next few weeks. Tanvir received numerous calls and visits at his workplace from Agents Tanzin and John Doe 1. Tanvir stopped answering their phone calls and asked them to stop their visits. Later, the agents asked Tanvir to submit to a polygraph test, and when he declined, they threated to arrest him. When Tanvir flew to Pakistan in July 2009 to visit his family, Agents Tanzin and John Doe 3 questioned Tanvir's sister at her workplace about Tanvir's travel.

After Tanvir returned to the United States in January 2010, he took a job as a long-haul trucker. The job required him to drive across the country and fly back to New York after he had completed his route.

In October 2010, Tanvir heard that his mother was visiting New York from Pakistan. Tanvir, who had been in Atlanta for work, booked a flight back to New York. When he arrived at the Atlanta airport, an airline employee told Tanvir that he could not fly. At that time, two FBI agents approached Tanvir and told

him to call the agents who had previously spoken to him in New York. Tanvir contacted Agent Tanzin, who instructed that other agents would contact Tanvir and that he should "cooperate." App'x at 79 ¶ 92. Unable to fly to New York, Tanvir traveled by bus—a 24-hour ride.

Two days later, FBI Special Agent Sanya Garcia contacted Tanvir. She told him that if he met with her and answered her questions, she would help remove his name from the "No Fly List." Tanvir declined, saying that he had already answered the FBI's questions. Because Tanvir believed he could no longer fly, and therefore could not return to New York after completing his one-way deliveries, he quit his job as a long-haul trucker.

On September 27, 2011, Tanvir filed a complaint with the DHS Traveler Redress Inquiry Program ("TRIP"), an administrative mechanism for filing a complaint about placement on the "No Fly List."

The next month, Tanvir purchased tickets to Pakistan for himself and his wife so that they could visit his ailing mother. The day before his flight, Agent Garcia told Tanvir that he would not be able to fly unless he met with her and answered her questions. Because of his urgent need to travel, Tanvir agreed to do so. After answering the same questions that the other agents asked him

previously, Tanvir pleaded with Agent Garcia to allow him to fly to Pakistan the next day. The next day, Agent Garcia told Tanvir that he could not fly. Moreover, she stated that he could not fly in the future unless he submitted to a polygraph test. Tanvir cancelled his flight and received only a partial refund. His wife traveled alone to Pakistan.

After this incident, Tanvir hired counsel. Tanvir's counsel communicated with FBI lawyers. The FBI lawyers directed Tanvir's counsel to the TRIP process, even though Tanvir had already submitted a TRIP complaint and not yet received any redress.

Tanvir persisted, buying another plane ticket to Pakistan to visit his ailing mother. On December 11, 2011, however, he was denied boarding and told he was on the "No Fly List." This was the third time Tanvir was barred from boarding a flight for which he had purchased a ticket.

In April 2012, nearly six months after Tanvir filed his complaint with TRIP, he received a response. The response did not acknowledge that he was on the "No Fly List," but noted that "no changes or corrections are warranted at this time." App'x at 83 ¶ 110. Tanvir appealed this TRIP determination.

14

In November 2012, Tanvir purchased another ticket to Pakistan in an effort to visit his ailing mother. Again, Tanvir was denied boarding when he arrived for his flight. An FBI agent approached Tanvir and his counsel at the airport and told them that Tanvir would not be removed from the "No Fly List" until he met with Agent Garcia.

In March 2013, ten months after Tanvir appealed his TRIP determination, he received a letter from DHS overturning that earlier determination. The letter blamed Tanvir's experience on probable "misidentification against a government record" or "random selection," and stated that the government "made updates" to its records. App'x at 83 ¶ 114. Following this communication, Tanvir purchased a plane ticket to Pakistan for June 2013. On June 27, 2013, Tanvir successfully boarded a flight to Pakistan. By this time, over five years had passed since Tanvir was first contacted by the FBI.

Tanvir asserts that because the federal agents wrongfully placed his name on the "No Fly List," Tanvir could not fly to visit his family in Pakistan, quit his trucking job, lost money from unused airline tickets, and feared additional harassment by the FBI.

*C.*     *Procedural History*

On October 1, 2013, Plaintiffs filed a complaint asserting that Defendants violated their constitutional and statutory rights by placing their names on the "No Fly List"—even though they posed no threat to aviation safety—in retaliation for their refusal to become informants for the government. On April 22, 2014, Plaintiffs filed an amended complaint.

Plaintiffs sued Defendants in their official capacities under the First Amendment, the Fifth Amendment, the Administrative Procedure Act, 5 U.S.C. §§ 702, 706, and RFRA, 42 U.S.C. § 200bb *et seq.*, seeking injunctive and declaratory relief. Plaintiffs also sued the federal agents in their individual capacities, seeking compensatory and punitive damages under the First Amendment and RFRA.[5]

On July 28, 2014, the Defendants filed two separate motions to dismiss the amended complaint. One motion sought to dismiss Plaintiffs' official capacity claims; the other sought to dismiss Plaintiffs' individual capacity claims.

---

[5] Plaintiffs and non-appealing plaintiff Awais Sajjad asserted a First Amendment retaliation claim against all 25 federal agents named as Defendants. Plaintiffs, excluding Sajjad, asserted a claim under RFRA against only the 16 federal agents named as Defendants that allegedly interacted with Plaintiffs.

On June 1, 2015, the government moved to stay Plaintiffs' official capacity claims, arguing that it had revised the redress procedures available to challenge one's designation on the "No Fly List," and that Plaintiffs had availed themselves of those procedures. On June 8, 2015, Plaintiffs received letters from DHS informing them that the government knows of no reason why they would be unable to fly. On June 10, 2015, Plaintiffs consented to a stay of their official capacity claims. The district court stayed those claims and terminated the government's related motion to dismiss. The parties continued to dispute Plaintiffs' individual capacity claims.

D.    *District Court Opinion*

On September 3, 2015, the district court issued an opinion and order dismissing Plaintiffs' individual capacity claims.

First, the district court dismissed Plaintiffs' First Amendment retaliation claims, stating that the Supreme Court and this Court have "declined to extend *Bivens* to a claim sounding in the First Amendment." *Tanvir v. Lynch*, 128 F. Supp.3d 756, 769 (S.D.N.Y. 2015) (quoting *Turkmen v. Hasty*, 789 F.3d 218, 236 (2d Cir. 2015), *rev'd in part and vacated and remanded in part sub nom. Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017)). Plaintiffs do not appeal that determination here.

17

Next, the district court held that RFRA does not permit the recovery of money damages from federal officers sued in their individual capacities. The district court determined that "Congress' intent in enacting RFRA could not be clearer." *Tanvir*, 128 F. Supp.3d at 780. Specifically, the court determined that Congress intended to restore the compelling interest test by which courts evaluated free exercise claims before the Supreme Court's decision in *Employment Division, Dept. of Human Res. of Or. v. Smith*, 494 U.S. 872 (1990). In doing so, it held that Congress did not express an intention to expand the remedies available to those individuals who asserted that their free exercise of religion was substantially burdened by the government.

The district court found this conclusion supported by the state of the law at the time RFRA was passed, and RFRA's legislative history. With respect to the former, the district court stated that, at the time *Smith* was decided, the Supreme Court had not recognized a *Bivens* remedy for claims under the Free Exercise Clause, and to allow damages in this case against federal employees would expand, rather than restore, the remedies available prior to *Smith*. With respect to the latter, the district court identified congressional reports stating that Congress in RFRA did not intend to "expand, contract or alter the ability of a claimant to

18

obtain relief in a manner consistent" with the Supreme Court's pre-*Smith* free exercise jurisprudence. *Tanvir*, 128 F. Supp.3d at 778 (quoting S. Rep. No. 103-111 at 12).

Finally, the district court rejected Plaintiffs' assertions with respect to *Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60 (1992). In *Franklin*, the Supreme Court stated that "we presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." *Id.* at 66. The district court nevertheless found that the traditional *Franklin* presumption did not apply here. In particular, the district court noted that *"Franklin* required the Supreme Court to interpret an *implied* statutory right of action," and held that *Franklin*'s "ordinary convention" does not control where, as here, Congress created an express private right of action. *Tanvir*, 128 F. Supp.3d at 779.

Plaintiffs appeal the district court's ruling that RFRA does not permit the recovery of money damages from federal officers sued in their individual capacities.[6] We agree with Plaintiffs, and reverse.

---

[6] Plaintiffs voluntarily dismissed their official capacity claims on December 28, 2015, rendering the district court's ruling on the individual claims a final appealable order. *See Tanvir v. Comey*, No. 1:13-cv-06951-RA (docs. 109, 111).

**DISCUSSION**

**I.    Standard of Review**

We review de novo a district court's dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). *Town of Babylon*, 699 F.3d at 227. When reviewing the dismissal of a complaint for failure to state a claim, we accept as true the factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

The district court here held that RFRA does not permit a plaintiff to recover money damages against federal officers sued in their individual capacities. *Tanvir*, 128 F. Supp.3d at 775. Where, as here, the district court decision below "presents only a legal issue of statutory interpretation," "[w]e review *de novo* whether the district court correctly interpreted the statute." *White v. Shalala*, 7 F.3d 296, 299 (2d Cir. 1993).

**II. Official Capacity and Individual Capacity Suits**

The district court held that RFRA does not permit the recovery of money damages against federal officers sued in their individual capacities. To frame our discussion, we briefly address the difference between official capacity suits and individual capacity suits.

The Supreme Court has stated that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (citation and internal quotation marks omitted). In an official capacity suit, "the real party in interest … is the governmental entity and not the named official." *Id.* By contrast, individual capacity suits "seek to impose individual liability upon a government officer for [her] actions under color of [] law." *Id.* Any damages awarded in an individual capacity suit "will not be payable from the public fisc but rather will come from the pocket of the individual defendant." *Blackburn v. Goodwin*, 608 F.2d 919, 923 (2d Cir. 1979).[7]

---

[7] Suits against public officers that seek damages are directed at the particular officer whose allegedly unlawful actions are claimed to have caused damage to plaintiffs. In contrast, suits against officers in their official capacity, which generally seek injunctive relief, are directed at the office itself. *See* Fed. R. Civ. P.

21

This distinction proves important with respect to the recovery of damages. "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999) (citation omitted). Sovereign immunity does not, however, shield federal officials sued in their individual capacities. *Lewis v. Clarke*, 137 S. Ct. 1285, 1291 (2017) ("[S]overeign immunity does not erect a barrier against suits to impose individual and personal liability.") (internal quotation marks omitted).

**III. Religious Freedom Restoration Act**

"As in any case of statutory construction, we start our analysis . . . with the language of the statute." *Chai v. Comm'r of Internal Revenue*, 851 F.3d 190, 217 (2d Cir. 2017) (citation omitted). "Where the statutory language provides a clear answer, our analysis ends there." *Id.* (citation and internal punctuation omitted). "[I]f the meaning of the statute is ambiguous, we may resort to canons of statutory interpretation to help resolve the ambiguity." *Id.* (citation and brackets omitted). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is

---

17(d). As a result, if the defendant in an official capacity suit leaves office, the successor to the office replaces the originally named defendant. *See* Fed. R. Civ. R. 25(d).

used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

*A.* *Statutory Text*

In 1993, Congress passed RFRA. 42 U.S.C. § 2000bb, *et seq*. Congress stated that its purposes in enacting RFRA were "to restore the compelling interest test" that been applied in cases where free exercise of religion was substantially burdened *and* "to provide a claim or defense to persons whose religious exercise is substantially burdened by government." 42 U.S.C. § 2000bb(b). Through RFRA, Congress sought "to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751, 2760 (2014).

RFRA provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the "Government" can "demonstrate[] that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a), (b).

In order to protect this statutory right, RFRA created an explicit private right of action. *Id.* § 2000bb-1(c). That section permits any "person whose

23

religious exercise has been burdened in violation of [the statute]" to "assert that violation as a claim or defense in a judicial proceeding and obtain *appropriate relief against a government*." *Id.* § 2000bb-1(c) (emphasis added). RFRA defines the term "government," to include "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States." *Id.* § 2000bb-2(1). RFRA does not define the term "appropriate relief."

In its decision below, the district court determined that the phrase "appropriate relief" did not include money damages from federal officials sued in their individual capacities. *See Tanvir*, 128 F. Supp.3d at 775. The district court did not address whether federal officers sued in their individual capacities are included within RFRA's definition of "government" and therefore amenable to suit under RFRA. *See id.* at 774 n. 17.

*B.* *"Against a Government"*

On appeal, the parties disagree over whether RFRA authorizes individual capacity suits against government officials. In construing the meaning of the term "government" under RFRA, we begin by reviewing RFRA's plain language. *See Chai*, 851 F.3d at 217. Because RFRA's plain language "provides a clear

24

answer," we conclude that RFRA authorizes individual capacity claims against federal officers. *Id.*

As discussed above, RFRA permits a plaintiff to assert a violation of the statute "as a claim or defense in a judicial proceeding and obtain relief against a government." 42 U.S.C. § 2000bb-1(c). RFRA defines "government" to include "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States." *Id.* § 2000bb-2(1). When we substitute that definition for the defined term, it is clear that a plaintiff may bring a claim for "appropriate relief against" either a federal "official" or "other person acting under color of [federal] law" whose actions substantially burden the plaintiff's religious exercise. Therefore, RFRA, by its plain terms, authorizes individual capacity suits against federal officers.

Defendants argue, to the contrary, that the plain text of RFRA permits suits only against officers in their official capacities and not suits against federal officers in their individual capacities. Defendants argue that we: (1) should give the term "government" its most natural reading; (2) should understand the phrase "official" in the statutory definition of "government" as suggesting that only official capacity suits are permitted; and (3) should conclude that the phrase

25

"or other person acting under color of law" is not intended to permit government officers to be sued in their individual capacities. We disagree with each argument.

First, we refuse Defendants' request to apply a natural reading of the term "government" in this case where RFRA includes an explicit definition of "government." 42 U.S.C. § 2000bb-2(1). "When a statute includes an explicit definition, we must follow that definition." *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000); *Upstate Citizens for Equality, Inc. v. United States*, 841 F.3d 556, 575 (2d Cir. 2016) ("In general, statutory definitions control the meaning of statutory words.") (internal quotation marks omitted). Further, the statute specifically defines 'government' to include officials and others acting under color of law. There would be no need to permit suits against government agents in their official capacity, since such a suit is simply a formal variant of an action that, in substance, runs against the government itself. *See Hafer*, 502 U.S. at 25.

Second, RFRA's use of the word "official" in the statutory definition of "government" does not mandate that a plaintiff may only obtain relief against federal officers in official capacity suits. In ordinary usage, an "official" is generally defined simply as "one who holds or is invested with an office" and is

26

roughly synonymous with the term "officer." Merriam-Webster Unabridged, http:/unabridged.merriam-webster.com/unabridged/official (noun definition). There is no reason to think that, in using this ordinary English word, Congress intended to invoke the technical legal concept of "official capacity," rather than simply to state that government "officials" are amenable to suit. Moreover, the statute permits suits against "officials (or other person[s] acting under color of law)." 42 U.S.C.A. § 2000bb-2(1). The specific authorization of actions broadly against "other person[s] acting under color of law," undercuts the assertion that the term "official"' was intended to limit the scope of available actions.

Further, a defendant's status as a federal officer "is not controlling" in determining whether a suit is, in reality, against the government. *Stafford v. Briggs*, 444 U.S. 527, 542 n. 10 (1980) (citation omitted). Rather, "the dispositive inquiry is 'who will pay the judgment?'" *Id.* A plaintiff may not sue a federal officer in her official capacity for money damages, because such suit seeks money from the federal government, and sovereign immunity would bar recovery from the federal government absent an explicit waiver. However, a plaintiff may sue a federal officer in her individual capacity without implicating sovereign

immunity concerns. *See Hafer*, 502 U.S. at 25-28. RFRA's use of the word "official" does not alter that rule.

Third, we reject Defendants' argument that the phrase "other person acting under color of law" authorizes only official capacity suits. Rather, that phrase "contemplates that persons 'other' than 'officials' may be sued under RFRA, and persons who are not officials may be sued *only* in their individual capacities." *Patel v. Bureau of Prisons*, 125 F. Supp.3d 44, 50 (D.D.C. 2015) (citing *Jama v. INS*, 343 F. Supp.2d 338, 374 (D. N.J. 2004)) (emphasis added). "Defendants' interpretation would render the entire phrase surplasage: once Congress authorized official-capacity suits against 'officials,' adding another term that allowed only official-capacity suits would have had no effect whatsoever." *Id.*

Our conclusion that RFRA authorizes individual capacity claims against federal officers is consistent with the Supreme Court's recognition of RFRA's "[s]weeping coverage," *City of Boerne v. Flores*, 521 U.S. 507, 532 (1997), which "was designed to provide very broad protection for religious liberty," *Hobby Lobby*, 134 S. Ct. at 2767. RFRA's reach "ensures its intrusion at every level of government, displacing laws and prohibiting official actions of almost every

28

description and regardless of subject matter." *City of Boerne*, 521 U.S. at 532 (further stating that RFRA's restrictions "apply to every agency and official of the Federal … Government[]").

Moreover, we draw support for our conclusion from Congress's use of comparable language in enacting 42 U.S.C. § 1983, which, long prior to RFRA's enactment, had consistently been held to authorize individual and official capacity suits. *See, e.g.*, *Hafer*, 502 U.S. at 25; *Graham*, 473 U.S. at 166. Section 1983 creates a private right of action against "persons" who, acting "under color of [law]," violate a plaintiff's constitutional rights—regardless of whether that person was acting pursuant to an unconstitutional state law, regulation, or policy. 42 U.S.C. § 1983.

We, like several of our sister circuits before us, do not find "this word choice [] coincidental," as "Congress intended for courts to borrow concepts from § 1983 when construing RFRA." *Mack v. Warden Loretto FCI*, 839 F.3d 286, 302 (3d Cir. 2016); *see also Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 738 (7th Cir. 2015); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834-35 (9th Cir. 1999). As these courts have explained, "[w]hen a legislature borrows an already judicially interpreted phrase from an old statute to use it in a new

29

statute, it is presumed that the legislature intends to adopt not merely the old phrase but the judicial construction of that phrase." *Sutton*, 192 F.3d at 834-35 (citation omitted); *Mack*, 839 F.3d at 302 (quoting same); *see also Leonard v. Israel Discovery Bank*, 199 F.3d 99, 104 (2d Cir. 1999) ("[R]epetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well.") (citation and ellipses omitted).

In light of this presumption, given both RFRA's and Section 1983's applicability to "person[s]" acting "under color of law," we hold that RFRA, like Section 1983, authorizes a plaintiff to bring individual capacity claims against federal officials or other "person[s] acting under color of [federal] law."

*C.      "Appropriate Relief"*

Having determined that RFRA permits individual capacity suits against government officers acting under color of law, we now turn to whether "appropriate relief" in that context includes money damages. In its opinion below, the district court held that "appropriate relief" did not include money damages in suits against federal officers in their individual capacities. *Tanvir*, 128 F. Supp.3d at 780-81. We disagree.

30

### a. Ambiguity and the *Franklin* Presumption

Starting with RFRA's statutory text, as we do in any case of statutory construction, we note that RFRA does not define the phrase "appropriate relief." *See Chai*, 851 F.3d at 217. Unable to draw further insight from a plain reading of the statute, we turn to the context in which the language is used and the context of the statute more broadly. *See Robinson*, 519 U.S. at 341.

In the context of RFRA's companion statute, the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*,[8] the Supreme Court acknowledged that the phrase "'appropriate relief' is open-ended and ambiguous about what types of relief it includes . . . Far from clearly identifying money damages, the word 'appropriate' is inherently context-dependent." *Sossamon*, 563 U.S. at 286. Indeed, "[i]n some contexts, 'appropriate

---

[8] The district court opinion aptly notes that RFRA and RLUIPA are companion statutes. *See Tanvir*, 128 F. Supp.3d at 775. After the Supreme Court in *City of Boerne*, 521 U.S. 507, determined that RFRA was unconstitutional as applied to state and local governments because it exceeded Congress's power under Section 5 of the Fourteenth Amendment, Congress passed RLUIPA pursuant to the Spending Clause and Commerce Clause. *See Tanvir*, 128 F. Supp.3d at 775 n. 18; *Sossamon v. Texas*, 563 U.S. 277, 281 (2011). "RLUIPA borrows important elements from RFRA . . . includ[ing] an express private cause of action that is taken from RFRA." *Sossamon*, 563 U.S. at 281. As a result, courts commonly apply RFRA case law to issues arising under RLUIPA and vice versa. *See Redd v. Wright*, 597 F.3d 532, 535 n. 2 (2d Cir. 2010).

31

relief' might include damages." *Webman v. Fed. Bureau of Prisons*, 441 F.3d 1022, 1026 (D.C. Cir. 2006). But in other contexts, "another plausible reading is that 'appropriate relief' covers equitable relief but not damages." *Id.* As with the analogous phrase in RLUIPA, we agree that the phrase "appropriate relief" in RFRA's statutory text is ambiguous.

Having made that determination, "we resort to canons of statutory interpretation to help resolve the ambiguity." *Chai*, 851 F.3d at 217. We turn to the "the venerable canon of construction that Congress is presumed to legislate with familiarity of the legal backdrop for its legislation." *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 115 (2d Cir. 2017); *see also Ryan v. Gonzales*, 568 U.S. 57, 66 (2013) ("We normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent."). We have stated:

> Of course, Congress may depart from [our traditional legal concepts] . . . But when a statute does not provide clear direction, it is more likely that Congress was adopting, rather than departing from, established assumptions about how our legal . . . system works. We will not lightly assume a less conventional meaning absent a clear indication that such a meaning was intended.

*Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 760 F.3d 151, 166 (2d Cir. 2014).

Congress enacted RFRA in the wake of *Franklin*, 503 U.S. 60, a Supreme Court decision issued over a year prior to the enactment of the statute. In *Franklin*, the Supreme Court stated that when faced with "the question of what remedies are available under a statute that provides a private right of action," it *"presume[s] the availability of all appropriate remedies unless Congress has expressly indicated otherwise." Id.* at 65-66 (emphasis added); *see also Carey v. Piphus*, 435 U.S. 247, 255 (1978) (upholding damages remedy under 42 U.S.C. § 1983, even though the enacting Congress did not "address directly the question of damages"). It based that presumption on a long-standing rule that "has deep roots in our jurisprudence:" that "[w]here legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Franklin*, 503 U.S. at 66 (alterations omitted). Applying this traditional presumption in the context of an implied right of action to enforce Title IX, the Supreme Court held that a damages remedy was available. *Id.* at 76.

RFRA permits plaintiffs to "obtain appropriate relief against a government," 42 U.S.C. § 2000bb-1(c), and includes no "express[] indicat[ion]" that it proscribes the recovery of money damages, *Franklin*, 503 U.S. at 66.

33

Because Congress enacted RFRA one year after the Supreme Court decided *Franklin*, and because Congress used the very same "appropriate relief" language in RFRA that was discussed in *Franklin*, the *Franklin* presumption applies to RFRA's explicit private right of action. In light of RFRA's purpose to provide broad protections for religious liberty, *Hobby Lobby*, 134 S.Ct. at 2760, and applying the *Franklin* presumption here, we hold that RFRA authorizes the recovery of money damages against federal officers sued in their individual capacities.[9]

### b. Defendants' Arguments to the Contrary

#### i. Precedent Does Not Require a Different Outcome

Defendants argue that our holding here is inconsistent with several decisions by the Supreme Court, our Court, and our sister circuits limiting the

---

[9] Indeed, the determination that RFRA permits individual capacity suits leads logically to the conclusion that it permits a damages remedy against those individuals. An individual capacity suit that is confined to injunctive relief has limited value; official capacity suits for injunctive relief already supply injunctive relief against the governmental entity as a whole. As a result, plaintiffs will rarely, if ever, prefer to enjoin the conduct of a single officer. In contrast, as noted above, suits seeking compensation from officers in their *official* capacity, being in essence suits against the state or federal government itself, are generally barred by sovereign immunity. Thus, individual capacity suits tend to be associated with damages remedies, and official capacity suits with injunctive relief.

recovery of money damages in suits under RFRA and RLUIPA. *See Sossamon*, 563 U.S. 277; *Washington v. Gonyea*, 731 F.3d 143, 145 (2d Cir. 2013); *Webman*, 441 F.3d at 1026; *Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 840-41 (9th Cir. 2012); *Davila v. Gladden*, 777 F.3d 1198, 1210 (11th Cir. 2015), *cert. denied sub nom. Davila v. Haynes*, 136 S.Ct. 78 (2015). Our holding, however, is not inconsistent with these decisions, each of which is based upon animating principles that are inapplicable here.

In *Sossamon*, the Supreme Court held that the phrase "appropriate relief" in RLUIPA does not permit the recovery of money damages against a state or state officers sued in their official capacities. 563 U.S. at 288. The Supreme Court based its conclusion on considerations relating to state sovereign immunity. Namely, when determining whether an act of Congress waives sovereign immunity, the Court stated that such language "will be strictly construed, in terms of scope, in favor of the sovereign." *Id.* at 285. Therefore, in that context, the Court's relevant inquiry was the opposite of the one at issue here: "not whether Congress has given clear direction that it intends to *exclude* a damages remedy, *see Franklin*, [503 U.S.] at 70-71, but whether Congress ha[d] given clear direction that it intend[ed] to *include* a damages remedy." *Sossamon*, 563 U.S. at

35

289 (emphasis in original). Because the phrase "appropriate relief" in that context did not "unequivocally express[]" Congress's intent to waive state sovereign immunity, the Supreme Court held that RLUIPA did not permit a suit for monetary damages against a state or state officials sued in their official capacities. *Id.* at 288.

Like *Sossamon*, several of our sister circuits have determined that RFRA's prescription for "appropriate relief" does not include damages against the federal government or its officers acting in their official capacities. *See Webman*, 441 F.3d at 1026; *Oklevueha Native Am. Church of Hawaii*, 676 F.3d at 840-41; *Davila* 777 F.3d at 1210. These courts so held because, in the context of suits against the federal government and its officers in their official capacities, the phrase "appropriate relief" similarly does not express an unambiguous waiver of the federal government's sovereign immunity. *See, e.g.*, *Davila*, 777 F.3d at 1210 ("Congress did not unequivocally waive its sovereign immunity in passing RFRA. RFRA does not therefore authorize suits for money damages against officers in their official capacities.").

The animating principles underlying *Sossamon, Webman, Oklevueha Native Am. Church of Hawaii*, and *Davila*, however, are absent from the instant case. Each

36

of those cases involved a question of whether "appropriate relief" under RFRA or RLUIPA permitted suits against a sovereign or its officers in their official capacities. Although the Supreme Court and our sister circuits declined to construe the phrase "appropriate relief" to amount to an explicit waiver of sovereign immunity, Plaintiffs' individual capacity suits against Defendants present no sovereign immunity concerns here. This is so because Plaintiffs seek monetary relief from those officers personally, not from the federal or state government. *See Hafer*, 502 U.S. at 25-28; *Blackburn*, 608 F.2d at 923. As we stated above, "Congress need not waive sovereign immunity to permit an individual-capacity suit against a federal official." *Patel*, 125 F. Supp.3d at 54 (citing *Larson*, 337 U.S. at 686-87).

Indeed, as the district court below acknowledged in its discussion of precedent, "[b]ecause these decisions . . . are grounded in principles of sovereign immunity, they are of limited assistance in addressing the question of damages against those who 'come to court as individuals.'" *Tanvir*, 128 F. Supp.3d at 775 n. 19 (quoting *Hafer*, 502 U.S. at 27). We agree and similarly find those cases inapplicable here where sovereign immunity concerns are not at play.

Furthermore, our holding that RFRA permits the recovery of money damages against federal officers sued in their individual capacities does not conflict with our decision in *Washington v. Gonyea*. In *Gonyea*, we held that the phrase "appropriate relief" in RLUIPA prohibits both the recovery of money damages from *state* officers sued in their official capacities and in their individual capacities. *Gonyea*, 731 F.3d at 145. The conclusion that RLUIPA does not permit the recovery of money damages from state officers sued in their official capacities follows directly from the Supreme Court's decision in *Sossamon.* 563 U.S. at 293 ("States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA because no statute expressly and unequivocally includes such a waiver.").

*Gonyea*'s conclusion that RLUIPA does not permit the recovery of money damages from state officers sued in their individual capacities follows from another source: the constitutional basis upon which Congress relied in enacting RLUIPA. RLUIPA "was enacted pursuant to Congress' spending power, which allows the imposition of conditions, such as individual liability, only on those parties actually receiving state funds." 731 F.3d at 145 (citation omitted). "Applying restrictions created pursuant to the Spending Clause to persons or

38

entities other than the recipients of the federal funds at issue would have the effect of binding non-parties to the terms of the spending contract." *Patel*, 125 F. Supp.3d at 52 (internal quotation marks omitted). "Indeed, to decide otherwise would create liability on the basis of a law never *enacted* by a sovereign with the power to affect the individual rights at issue—*i.e.*, the state receiving the federal funds—and this would raise serious questions regarding whether Congress had exceeded its authority under the Spending Clause." *Gonyea*, 731 F.3d at 146 (emphasis in original; citations and internal punctuation omitted). As a result, in *Gonyea*, we held that RLUIPA did not permit a plaintiff to sue state officials in their individual capacities because the state prison, and not the state prison officials, was the 'contracting party,' which had "agree[d] to be amenable to suit as a condition to received funds." *Id.* at 145.

RFRA, by contrast, was enacted pursuant to Section 5 of the Fourteenth Amendment and the Necessary and Proper Clause. *Hankins v. Lyght*, 441 F.3d 96, 105 (2d Cir. 2006). RFRA's constitutional bases thus "do[] not implicate the same concerns" as those relevant to RLUIPA and the Spending Clause, which we addressed in *Gonyea*. *Mack*, 839 F.3d at 303-04; *see also Tanvir*, 128 F. Supp. 3d at 775 n. 19. Because the animating principles underlying our decision in *Gonyea* are

39

absent in the instant case, our holding here—that RFRA permits the recovery of money damages from federal officials sued in their individual capacities—and our holding in *Gonyea*—that RLUIPA does not permit the recovery of money damages from state officials sued in their individual capacities—are entirely consistent.

Defendants complain that our holding in this case makes the phrase "appropriate relief" in RFRA into a chameleon. *See United States v. Santos*, 553 U.S. 507, 522 (2008) (plurality op.) (stating that the Supreme Court has "forcefully rejected" the "interpretive contortion" of "giving the same word, in the same statutory provision, different meanings in different factual contexts") (emphasis omitted). But that is incorrect. To the contrary, we are tasked with interpreting the meaning of RFRA's phrase "appropriate relief," an inquiry that is "inherently context-dependent." *Sossamon*, 563 U.S. at 286. Indeed, the word 'appropriate' does not change its meaning; rather, the question addressed in each of these various contexts is what sort of relief is 'appropriate' in that particular situation. And, since the relevant animating principles vary appreciably across legal contexts, the meaning of 'appropriate' may well take on different meanings in different settings.

At the time of the district court decision below, neither the Supreme Court nor any of our sister circuits had squarely addressed whether RFRA provides for money damages.[10] Since then, however, the Third Circuit has held, as we do now, that RFRA authorizes individual capacity suits against federal officers for money damages. *See Mack*, 839 F.3d at 304.

In *Mack*, the Third Circuit reached that holding by applying the *Franklin* presumption—that any "appropriate relief" is available unless Congress expressly indicates otherwise. *Id.* at 302-03. The court found that its conclusion was buttressed by the fact that, in enacting RFRA, Congress used the exact language ("appropriate relief") discussed by the Supreme Court in *Franklin. Id.* at 303. "Congress enacted RFRA one year after *Franklin* was decided and was therefore well aware that 'appropriate relief' means what it says, and that,

---

[10] The Seventh Circuit has previously decided that a plaintiff was entitled to sue state prison officials in their individual capacities for damages. *Mack v. O'Leary*, 80 F.3d 1175, 1177 (7th Cir. 1996) (Posner, *J.*), *vacated on other grounds*, 522 U.S. 801 (1997). Before reaching that conclusion, the court noted that RFRA "says nothing about remedies except that a person whose rights under the Act are violated 'may assert that violation as a claim or defense in a judicial proceeding and obtain *appropriate* relief against a government.'" *Id.* (emphasis in original) (quoting 42 U.S.C. § 2000bb-1(c)). The court also acknowledged that the defendants in that case did not contest the availability of damages as a remedy under RFRA. *Id.*

without expressly stating otherwise, all appropriate relief would be available."

*Id.* at 303.[11] In light of RFRA's purpose of providing broad religious liberty protections, the Third Circuit concluded that it saw "no reason why a suit for money damages against a government official whose conduct violates RFRA would be inconsistent with" that purpose. *Id.*[12]

We agree with the Third Circuit's reasoning in *Mack* and adopt it here. In particular, we reject a strained reading of "appropriate relief" that would be less generous to plaintiffs under RFRA than under implied rights of action, and thus would undermine Congress's intention to "provide broad religious liberty protections." *Id.* Further, as one district court has pointed out, "[i]t seems

---

[11] Of note, the Third Circuit in *Mack* stated that "[b]ecause Mack brings his RFRA claim against only [two federal officers] in their individual capacities, the federal government's sovereign immunity to suits for damages is irrelevant here." *Id.* at 302 n. 92.

[12] The court in *Mack* drew further support from the similarities between RFRA and 42 U.S.C. § 1983, which has long permitted money damages against state officials sued in their individual capacities. *Id.* By comparison, the court distinguished its earlier decision in *Sharp v. Johnson*, 669 F.3d 144, 154-55 (3d Cir. 2012), in which it found that RLUIPA did not provide for money damages against state officials sued in their individual capacities, by pointing out how Congress's constitutional authorization for RLUIPA (Commerce Clause and Spending Clause) poses concerns not relevant to its analysis of RFRA (Necessary and Proper Clause and Section 5 of Fourteenth Amendment).

unlikely that Congress would *restrict the kind of remedies* available to plaintiffs who challenge free exercise violations in the same statute it passed to *elevate the kind of scrutiny* to which such challenges would be entitled." *Jama*, 343 F. Supp.2d at 374-75 (emphasis in original). Given that Congress has not specified that individual capacity suits for money damages should be barred under RFRA, and that, unlike in the RLIUPA context, no constitutional conflict prevents their application, we find that such suits are wholly appropriate under this statutory scheme.

           ii.  The *Franklin* Presumption Is Not Confined to Statutes with Implied Rights of Action

The district court below found that the *Franklin* presumption did not apply in the instant case. *Tanvir*, 128 F. Supp.3d at 779. In making that determination, the district court noted that *Franklin* "required the Supreme Court to interpret the scope of an *implied* statutory right of action." *Id.* (emphasis in original). By comparison, Congress created an express private right of action in RFRA. *See* 42 U.S.C. § 2000bb-1(c). The district court held that "the *Franklin* presumption is thus inapplicable" to RFRA "and the meaning of 'appropriate relief' must be discerned using the traditional tools of statutory construction." *Tanvir*, 128 F.

43

Supp.3d at 779. Applying those tools, the district court discerned that Congress lacked an intent to permit money damages under RFRA through its use of the phrase "appropriate relief." *Id.*

Although *Franklin* indeed considered the availability of damages under a statute with an implied private right of action, we are not convinced that the district court's distinction is correct. The logical inference, in our view, runs the other way: one would expect a court to be more cautious about expanding the scope of remedies available for a private right of action that is *not* explicitly provided by Congress, than in determining what remedies are available for a right of action that Congress has expressly created. This is particularly true where, in creating the right of action, Congress has also explicitly authorized courts to provide any "appropriate relief," without limitation. In fact, the Court in *Franklin* recounted its own case, *Kendall v. United States ex rel. Stokes*, in which it held that damages were available under a statute with an explicit private right of action where that statute failed to specify the remedies available. 37 U.S. (12 Pet) 524, 624 (1838) (stating that to find otherwise would present "a monstrous absurdity in a well organized government, that there should be no remedy, although a clear and undeniable right should be shown to exist").

44

As discussed above, the Third Circuit in *Mack* applied the *Franklin* presumption in determining that RFRA's express private right of action permitted the recovery of money damages against individuals sued in their individual capacities. *Mack*, 839 F.3d at 303-04; *see also Patel*, 125 F. Supp.3d at 53 n. 1 ("[T]he mere mention of remedies [in RFRA] does not rebut the [*Franklin*] presumption;" rather, the phrase "appropriate relief" "does nothing more than authorize what courts applying *Franklin* presume, and it falls far short of an express indication that damages are prohibited.") (internal punctuation omitted). Other courts have applied the *Franklin* presumption in the context of statutes containing express private rights of action. *See, e.g.*, *Reich v. Cambridgeport Air. Sys.*, 26 F.3d 1187, 1191 (1st Cir. 1994) (applying *Franklin* presumption to conclude that "all appropriate relief" under Section 11 of the Occupational Safety and Health Act included money damages); *Ditulio v. Boehm*, 662 F.3d 1091, 1098 (9th Cir. 2011) (holding that punitive damages were available under the Trafficking Victims Protection Act, which permits the recovery of "damages," because the court "follow[s] the 'general rule' that we should award 'any appropriate relief in a cognizable cause of action brought pursuant to a federal statute'" (quoting *Franklin*, 503 U.S. at 71)).

We disagree with the district court's decision to limit the application of the *Franklin* presumption in this case. The *Franklin* presumption need not be confined to only those cases interpreting the remedies available under an implied private right of action. To the contrary, "[t]he same presumption applies here—more so, we think, because Congress expressly stated that a claimant may obtain 'appropriate relief' against a government—the exact language used in *Franklin*." *Mack*, 839 F.3d at 303. Thus, we reject the district court's position that the *Franklin* presumption does not apply in interpreting the meaning of "appropriate relief" under RFRA.

### iii. Legislative History

Although we conclude that the *Franklin* presumption extends to express private rights of action, the presumption can be rebutted. Pursuant to *Franklin*, "we presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise," 503 U.S. at 66, and our analysis of whether Congress intended to limit the application of this general principle will vary depending on whether the right of action is implied or explicit.

Where a statutory cause of action is implied, it is futile to resort to the statutory text and legislative history, because Congress usually has not spoken

46

about remedies applicable to a right that the federal courts, rather than Congress, created. *See id.* at 71 ("[T]he usual recourse to statutory text and legislative history. . . necessarily will not enlighten our analysis."). Accordingly, our analysis of Congress's intent in such contexts "is *not* basically a matter of statutory construction," but rather a matter of "evaluat[ing] the state of the law when the Legislature passed [the statute]." *Id.* (emphasis in original).

On the other hand, where the private right of action is express, the statutory text and legislative history may enlighten our understanding. The question thus becomes whether these interpretative sources exhibit a "clear direction" by Congress that the federal courts lack "the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Id.* at 70-71. We conclude that neither the statutory text nor the legislative history provides such a clear direction here.

As noted above, the district court supported its conclusion in part by referencing legislative history indicating that RFRA was intended solely to reverse the Supreme Court's decision in *Smith*. *See Tanvir*, 128 F. Supp. 3d at 778-80. For instance, the Senate Committee Report, which discusses the background and purpose for RFRA, states that "the purpose of this act is only to overturn the

Supreme Court's decision in *Smith*," S. Rep. No. 103-111, at 12 (1993), and by doing so restore the compelling interest test to free exercise claims, *id.* at 8. The House Committee Report similarly focuses on the effect of the *Smith* decision and the resulting outcome that free exercise claims receive the "the lowest level of scrutiny employed by the courts." H.R. Rep. No. 103-88, at 5-6 (1993).

The Senate and House Committee Reports, however, are not conclusive as to the meaning of RFRA's statutory text. The statutory text of RFRA reflects a dual purpose: "to restore the compelling interest test" applied by the Supreme Court in free exercise cases before *Smith*, and "to provide a claim or defense to persons whose religious exercise is substantially burdened by government." 42 U.S.C. § 2000bb(b). In accomplishing the latter purpose, Congress also codified a statutory cause of action to bring claims against officials in their individual capacities—a type of action never explicitly authorized (or foreclosed) by the Supreme Court's free exercise jurisprudence. Congress accordingly went beyond merely restoring the compelling interest test. It removed ambiguity about who could be held liable for violations of religious exercise.[13]

---

[13] The Supreme Court also has indicated that RFRA's least restrictive means requirement may well have gone beyond what was required by its pre-*Smith*

48

The legislative history further fails to provide an "express[]" and "clear direction" that Congress intended to preclude litigants from seeking damages in these individual capacity suits. *Franklin*, 503 U.S. at 66, 70. To be sure, the House and Senate Committee Reports each contain similar language stating, "[t]o be absolutely clear, the bill does not expand, contract or alter the ability of a claimant to obtain relief in a manner consistent with free exercise jurisprudence, including Supreme Court jurisprudence, under the compelling governmental interest test prior to *Smith*." H.R. Rep. No. 103-88, at 8; *see also* S. Rep. No. 103-

decisions. *See City of Boerne*, 521 U.S. at 509 ("[T]he least restrictive means requirement was not used in the pre-*Smith* jurisprudence RFRA purported to codify."); *see also Hobby Lobby*, 134 S. Ct. at 2761 n. 3 (observing that *City of Boerne* reflects an understanding that RFRA's least restrictive means requirement "provided even broader protection for religious liberty than was available under those [pre-*Smith*] decisions"); *id.* at 2767 n. 18 (declining to decide whether RFRA's least restrictive means requirement in fact "went beyond what was required by our pre-*Smith* decisions"); *id.* at 2793 (Ginsburg, *J.*, dissenting) ("Our decision in *City of Boerne*, it is true, states that the least restrictive means requirement was not used in the pre-*Smith* jurisprudence RFRA purported to codify. As just indicated, however, that statement does not accurately convey the Court's pre-*Smith* jurisprudence.") (internal quotation marks and citation omitted). If RFRA's least restrictive means requirement in fact went beyond pre-*Smith* jurisprudence, such an extension further supports our holding that RFRA provides an individual damages remedy. We need not decide this dispute today, however, because our holding remains the same in light of RFRA's statutory text and legislative history.

111, at 12 ("To be absolutely clear, the act does not expand, contract or alter the ability of a claimant to obtain relief in a manner consistent with the Supreme Court[']s[] free exercise jurisprudence under the compelling governmental interest test prior to *Smith*."). It does not follow, however, that Congress therefore intended to limit the remedies available for RFRA violations.

As an initial matter, the broader legislative history shows that the House and Senate Committee Reports were not using the term "relief" to refer to remedies. Rather, the reports were concerned with claimants bringing particular causes of action. *See generally* Douglas Laycock & Oliver S. Thomas, *Interpreting the Religious Freedom Restoration Act*, 73 Tex. L. Rev. 209, 236-39 (1994). During the House and Senate hearings, several religious and social organizations raised concerns that claimants would use RFRA to challenge restrictions on abortion, tax exemptions, and government funding for religious organizations.[14] These

---

[14] *See Religious Freedom Restoration Act of 1991: Hearings on HR. 2797 Before the Subcomm. on Civil and Constitutional Rights of the H. Comm. on the Judiciary*, 102d Cong. 33-35, 40-43 (1992) (statement of Mark E. Chopko, Gen. Counsel, United States Catholic Conference); *id.* at 270-301 (statement of James Bopp, Jr., Gen. Counsel, National Right to Life Committee, Inc.); *The Religious Freedom Restoration Act: Hearing on S. 2969 Before the Sen. Comm. on the Judiciary*, 102d Cong., 99-115 (1992) (statement of Mark E. Chopko, Gen. Counsel, United States

concerns were sufficiently serious that several key Republican representatives withdrew their support for the bill and introduced legislation that explicitly prohibited claimants from using the statute to affect those issues. *Id.*; *see also* H.R. 4040, 102d Cong. § 3(c)(2) (1991).

RFRA's lead sponsors subsequently agreed to compromise language in the House and Senate Committee Reports addressing these concerns, and made clear that the act "does not expand, contract or alter the ability of a claimant to obtain relief" in accordance with the federal courts' free exercise jurisprudence. Laycock & Thomas, *supra*, at 236-39; *see also* S. Rep. No. 103-111, at 12; H.R. Rep, No. 103-88, at 8. The reports accordingly stated that claims challenging abortion restrictions should be adjudicated pursuant to the Supreme Court's decision in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), and that the bill does "not change the law" determining whether religious organizations may receive public funding or enjoy tax exemptions. S. Rep. No. 103-111, at 12; HR, Rep. No. 103-88, at 8. Taken in context, it is thus clear that Congress was not concerned with limiting plaintiffs' available remedies under

Catholic Conference); *id.* at 203-37 (statement of James Bopp, Jr., Gen. Counsel, National Right to Life Committee, Inc.).

the act—it was concerned with preventing plaintiffs from pursuing certain causes of action.[15]

Moreover, even if the compromise language in the House and Senate Committee Reports could be read as excluding certain remedies from RFRA's scope, it does not clearly indicate that Congress intended to exclude an individual damages remedy. As previously noted, the Senate Committee Report states that the act does not "alter the ability of a claimant to obtain relief in a manner consistent with the Supreme Courts'[] free exercise jurisprudence … prior to *Smith*." S. Rep. No. 103-111, at 12. The Supreme Court, in turn, never ruled out the possibility of plaintiffs' bringing individual damages claims for free exercise violations before *Smith* was decided. To the contrary, in *Bivens v. Six*

---

[15] The floor debate likewise confirms that Congress intended to limit the causes of action that could be brought under the statute. Representative Henry Hyde stated that he had offered amendments to RFRA because he was concerned that the legislation would "create an independent statutory basis" for individuals to challenge restrictions on abortion, social service programs operated by religious institutions with public funds, and the tax-exempt status of religious institutions. 139 Cong. Rec. 103, 9682 (1993). Representative Hyde further stated that his concerns were "resolved either through explicit statutory changes or through committee report language," which "ma[de] clear" that "such claims are not the appropriate subject of litigation" under RFRA, and that the "bill does not expand, contract, or alter the ability of a claimant to obtain relief" consistent with free exercise jurisprudence prior to *Smith*. *Id.*

*Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court held that victims of Fourth Amendment violations could pursue individual damages claims against officials, and it extended this principle in *Carlson v. Green*, 446 U.S. 14, (1980), to permit individual damages claims for constitutional violations unless the defendants could show that Congress "provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution," or there are "special factors counseling hesitation in the absence of affirmative action by Congress," *id.* at 18-19 (emphasis omitted). It was therefore at least possible at the time that Congress passed RFRA that an individual damages claim would have been available for a free exercise violation. Given this potential, we cannot say that the Senate Committee Report expressly intended to exclude such a remedy when it stated that it did not intend to "expand" or "alter" claimants' ability to obtain relief. S. Rep. No. 103-111, at 12.[16]

---

[16] To be sure, the Supreme Court has subsequently shown "caution toward extending *Bivens* remedies into any new context," *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001), and "[s]ince *Carlson* in 1980, the Supreme Court has declined to extend the *Bivens* remedy in any new direction at all," *Arar v. Ashcroft*, 585 F.3d 559, 571 (2d Cir. 2009). This trend, however, was not clearly apparent at the time of RFRA's passage because the Court had recognized *Bivens*

Furthermore, even if the Senate Committee Report could be read to limit RFRA's remedies to those explicitly authorized by the Supreme Court prior to *Smith*, the approach of the House Committee Report is not necessarily so narrow. Unlike the Senate Committee Report, which authorizes relief "consistent with the Supreme Courts'[] free exercise jurisprudence," S. Rep. No. 103-111, at 12, the House Committee Report authorizes relief so long as it is "consistent with free exercise jurisprudence, including Supreme Court jurisprudence," H.R. Rep. No. 103-88, at 8. The House Committee Report therefore appears to have contemplated providing a broad array of relief consistent not only with Supreme Court jurisprudence but that of the lower courts as well. We thus find it highly relevant that at the time of RFRA's passage, several Courts of Appeals had held that plaintiffs could pursue individual damages claims for violations of their free

claims in three instances and denied such claims in four. *See id.* at 571-72. Additionally, although the Supreme Court in *Bush v. Lucas*, 462 U.S. 367, 368 (1983), held that federal employees could not bring *Bivens* claims against their superiors, the decision was narrow, and based on federal employees' existing access to "an elaborate remedial system" that protected their constitutional rights, *id.* at 388. That remedial framework is not applicable here, because the plaintiffs are not federal employees. Moreover, even if the trend away from extending *Bivens* were obvious when RFRA was passed, it still falls short of the Supreme Court's clearly foreclosing an individual damages remedy for free exercise violations. We therefore conclude that it would not be a basis for finding the *Franklin* presumption inapplicable here.

exercise rights. *See Caldwell v. Miller*, 790 F.2d 589, 607-608 (7th Cir. 1986); *Jihaad v. O'Brien*, 645 F.2d 556, 558 n. 1 (6th Cir. 1981); *see also Paton v. La Prade*, 524 F.2d 862, 870 (3d Cir. 1975) (holding that *Bivens* claims are broadly available for First Amendment violations); *Scott v. Rosenberg*, 702 F.2d 1263, 1271 (9th Cir. 1983) (assuming, without deciding, that the plaintiff could recover damages if his free exercise rights had been violated).

Accordingly, we do not believe that the legislative history evinces a clear and express indication that Congress intended to exclude individual damages claims from the scope of RFRA's available relief, and we therefore conclude that the *Franklin* presumption is applicable.

**VI. Qualified Immunity**

Having held that RFRA authorizes a plaintiff to sue federal officers in their individual capacities for money damages, we consider whether those officers should be shielded by qualified immunity.

At the panel's request, the parties submitted supplemental briefing addressing two questions: (1) "whether, assuming *arguendo* that RFRA authorizes suits against officers in their individual capacities, [Defendants] would be entitled to qualified immunity," and (2) "whether *Ziglar v. Abbasi*, No. 15-1358,

2017 WL 2621317 (June 19, 2017), applies in any relevant way to this question or the other questions presented in this appeal." Order, *Tanvir v. Tanzin*, No. 16-1176 (2d Cir. 2017), Dkt. No. 83; *see also* Post-Argument Ltr. Brs., *Tanvir v. Tanzin*, No. 16-1176 (2d Cir. 2017), Dkt Nos. 89-90, 93-94.

We are sensitive to the notion that qualified immunity should be resolved "at the earliest possible stage in the litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). Indeed, we have, in some circumstances, "permitted the [qualified immunity] defense to be successfully asserted in a Rule 12(b)(6) motion." *McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004). Nevertheless, as a general matter, "[i]t is our practice in this Circuit when a district court fails to address the qualified immunity defense to remand for such a ruling." *Eng v. Coughlin*, 858 F.2d 889, 895 (2d Cir. 1988) (citing *Francis v. Coughlin*, 849 F.2d 778, 780 (2d Cir. 1988)).

Here, the district court decision below did not address whether Defendants were entitled to qualified immunity. Similarly, until the panel prompted the parties at oral argument and in its post-argument order, neither side fully addressed or briefed the issue of qualified immunity on appeal. In the absence of a more developed record, we decline to address in the first instance

whether the Defendants are entitled to qualified immunity. We remand to the district court to make such determination in the first instance.

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the district court and remand for further proceedings.